## Case No. 1,015.

### BARNES et al. v. BILLINGTON et al.

[1 Wash. C. C. 29;[1] 4 Day, 81, note.]

Circuit Court, D. Pennsylvania.   April Term, 1803.

ACT OF BANKRUPTCY — CONCEALED DEBTOR—SERVICE OF PROCESS — CONFESSION OF JUDGMENT — EXECUTION—LEVY—LIEN.

1. A debtor concealing himself from, and being denied to his creditors, does not constitute an act of bankruptcy under the laws of the United States, unless the service of process is thereby prevented.

2. If the debtor order himself to be denied to creditors and others, and is in consequence thereof denied to an officer who comes to serve process, it is an act of bankruptcy; provided the officer comes to serve the process and not on other business, and the denial has taken place within six months of the issuing of the commission.

3. Giving a bond with warrant to confess judgment, to one creditor, upon the eve and in contemplation of bankruptcy, does not constitute an act of bankruptcy; unless the judgment entered on the bond, and the issuing of the execution was at the instance or by the procurement of the debtor. Such a bond would be a fraud on the general creditors.

4. Denial to an officer, whereby he is prevented serving process, must be really adversary, and not by concert between the creditor and the debtor to bring about an act of bankruptcy.

5. An execution executed upon the estate of the debtor previous to an act of bankruptcy, gives a lien to the execution creditor, provided the levy be real and bona fide.

[See Haughey v. Albin, Case No. 6,222; Goddard v. Weaver, Id. 5.495; Witt v. Hereth, Id. 17,921; In re Wilbur, Id. 17,633; Webster v. Woolbridge, Id. 17,340; In re Bernstein, Id. 1,350; In re Burns, Id. 2, 182.]

[6. The effect of a seizure under an execution is to change the property in the goods, and vest it in the sheriff.]

[Cited in Bayard v. Bayard, Case No. 1,129; Thompson v. Phillips, Id. 13,974.]

7. An execution is not levied so as to give a lien against purchasers or creditors, if the property is permitted to remain with the debtor. The lien is lost by suffering the property to remain with the debtor as his own until a subsequent execution is levied, or a bona fide sale is made.

8. To make a levy effectual, the property seized should be specially designated in the return of the execution, or by reference to a schedule accompanying it.

9. When a certificated bankrupt, and who has released all future claims upon his estate, is a competent witness.

At law. This was an action of trespass brought by [Barnes and others] the assignees [in bankruptcy of M'Claws] against Billington and Corless, at whose suit an execution had issued, and to satisfy which, the de-

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

fendant, Israel Israel, the sheriff, had sold the goods of the bankrupt, after an act of bankruptcy committed, and notice of the title of the plaintiffs.

The case is fully stated in the charge given to the jury by WASHINGTON, Circuit Justice, after a very full argument of two days.

Ingersoll, Lewis, and Dallas, for plaintiffs.
Tilghman and Ross, for defendants.

WASHINGTON, Circuit Justice. The facts in this case, not disputed. are, that on the 9th of August 1800, Billington relieved M'Claws, a trader within the meaning of the bankrupt law, from being taken on a bail piece, by giving his note to the creditor. To secure Billington, M'Claws gave him his bond with a warrant of attorney to confess judgment, which was accordingly entered up on the 12th, on which day an execution issued, and was delivered to the sheriff. On the 13th of January 1801, M'Claws gave his bond to Billington and Corless, with a warrant of attorney to confess judgment, for about 5,400 dollars. This was given to secure them for certain notes which they had, in November and December 1800, given to judgment creditors of M'Claws, at sixty and ninety days, and which relieved him from those creditors. Judgment on this bond was entered up on the 14th of January, on which day an execution issued. which was delivered to the sheriff, and returned in the following words, viz: "levied on goods as per inventory." No inventory however was made or accompanied the return. The goods, by the permission of Billington and Corless, remained in possession of M'Claws, in his store in Chesnut street, where he continued to carry on his trade, buying and selling, until the 31st of May; when the sheriff, under the execution of the 14th of January, took possession of all the goods in this store, and put a lock on the door. On the 1st of June following, a capias issued against M'Claws, at the suit of Goodwin. The property seized by the sheriff to satisfy Billington and Corliss' execution, was advertised for sale on the 1st of June. and was sold on the 8th.

On the 5th of June, a commission of bankruptcy issued against M'Claws. On the 6th, a warrant of seizure was delivered to Hall, the messenger of the commissioners, who, finding the store in Chesnut street locked and in possession of the sheriff, put a padlock on the door, and then executed the same on the goods in the house in Market street, to which M'Claws had removed early in May preceding. At the same time, viz. on the 6th, Hall delivered a notice from the attorney of the general creditors to the sheriff, forewarning him from selling the goods, as they were claimed on their behalf. They were however sold as above mentioned.

Mathews, who was a clerk under M'Claws, swears; that in December 1800, M'Claws was much embarrassed in his circumstances, and gave him general orders to deny him to his creditors, keeping himself in his room; though upon his cross-examination, he admitted that M'Claws went out publicly into the streets in that month, and afterwards as usual. That creditors frequently called, and were denied. That Hartung, a sheriff's officer, called in December, and was denied. That after M'Claws removed to Market street, in May 1801, he kept his front door shut and locked. This was however not the case in Chesnut street, where his store door was open, and business carried on as usual.

M'Claws, the bankrupt, was examined as a witness, and although I admitted him as a competent witness, you will decide as to the credit to be given to his testimony. He states that he was embarrassed as far back as October 1800; that there was then a judgment against him, and an execution taken out and lying in the office. That the defendants Billington and Corless, with professions of friendship, and a desire to serve him, and after an examination of his books, proposed to give their notes at sixty and ninety days to satisfy all his creditors by judgment and execution. That this plan was actually carried into execution in November and December 1800, which produced the effect not only of discharging him from those pressing claims, but enabled him to go on again with his business as formerly, and quieted the alarm which his embarrassments had excited. He admits, that at that time he informed Billington and Corless that he could pay twenty shillings in the pound if he should be fortunate in collecting his outstanding debts. No security whatever was taken by Billington and Corless at that time, but on the 13th of January they pressed him for security, saying that it was desired on account of the wife and family of M'Claws, who were strangers. Though he considered this as giving them a preference, yet his gratitude for the aids they had offered him, induced him to acquiesce. He accordingly gave them, at their request, the bond with a warrant of attorney to confess judgment, as before mentioned. He says, that on the 31st of May he was informed by Billington and Corless, that they had ordered the goods in the store in Chesnut street to be sold to satisfy their execution, issued on the 14th, that he complained of this treatment, and offered to release them from their liability by security, if they would wait twenty days. They were inexorable, and on the same day he gave notice of this proceeding to his principal creditors. On the 1st of June, Suter, (as appears by his deposition) being a sheriff's officer, was applied to by Goodwin to serve a writ upon M'Claws. He desired Goodwin to go to the house and wait for him, and he would join him there in a short time. When he came, he found Goodwin there, the door of the house fastened, and admittance refused

by some person from within, who said M'Claws was not at home. Shortly after, however, M'Claws raised up a window, and informed the officer he could not see him, and that he would not be arrested at that time. Upon quitting the house, Goodwin offered Suter two dollars, at which he was surprised, but at length said "I suspect you want to make M'Claws a bankrupt; if so, the fee on those occasions is eight dollars." Goodwin replied that he should be paid the eight dollars. Some time afterwards he applied to Goodwin for the six dollars, who replied, that M'Claws would pay him. This M'Claws refused to do, and Suter was obliged to warrant Goodwin for it.

Fisher and Stricker, two sheriff's officers, state, that M'Claws was publicly out as usual in December, and so on as long as he lived in Chesnut street; that he frequently came to the sheriff's office, and requested, if any thing should come against him, to let him know, and he would at once give bail; that he spoke of making arrangements to pay Billington and Corless' judgment, which Stricker says led them to postpone the sale of his property, as he thinks. Reed and Jones also speak of seeing M'Claws publicly in the street in December, and up to May, and discovered no difference in his conduct, or any attempt to withdraw himself.

Upon this evidence, the first question is, did M'Claws commit an act of bankruptcy on the 1st of June 1801, or at any preceding period, within six months of the 5th of June, when the commission issued. If he did, then, secondly, what effect would it have upon Billington and Corless' execution of the 14th January?

First. In examining the first question, we must proceed by steps. Did he commit an act of bankruptcy at any time before the 13th of January 1801?

M'Claws and Mathews give evidence of his embarrassments, of his orders to be denied to creditors, and it appears that he actually was denied. Other witnesses say that he went out publicly, and carried on business as usual. But, though it were clear that he did attempt to conceal himself from his creditors, and was denied to them, this would not constitute an act of bankruptcy under the bankrupt laws of the United States, though it would under the bankrupt laws of England. The first class of cases in our statute, which constitutes an act of bankruptcy, is going out of the state, remaining absent therefrom, concealing himself within the state, or keeping his house with intent to delay or defraud his creditors, so that he cannot be served with process. So that concealment from or denial to creditors, is not an act of bankruptcy, if it does not prevent the service of process. But it seems that he was denied to Hartung, a sheriff's officer, in December 1800. As to this, the law is, that if the debtor, with intention to delay or defraud his creditors, shall so conceal himself

or keep his house, that he cannot be served with process, this is an act of bankruptcy. Mathews proved that this officer called and was denied, but does not say on what day in December. It is immaterial whether the order of M'Claws to his clerk was to deny him to creditors only, or to them and others; for, if in consequence of concealment from creditors only, a denial was made to an officer, who was thereby prevented from serving process upon him, it would have been an act of bankruptcy.

But there are two reasons why the refusal to Hartung did not constitute an act of bankruptcy: First, because it does not appear that he came to serve him with process, and secondly, if it did so appear, it should also be proved to your satisfaction that the circumstance took place on or after the ⌐th of December, within six months previous to taking out the commission. As to the first point, it is clear, that unless the officer goes to the house of the debtor to serve process, it cannot be said that the concealment prevented him from serving process. Upon the same principle it is, that in England, where denial to a creditor will constitute an act of bankruptcy, it must be a creditor coming to demand payment of a debt. The officer or the creditor might call as a friend or neighbour, and not with a view to serve process or to demand a debt.

The next period to be noticed is the 13th of January 1801. The bond executed on that day, it is said, was giving a preference to Billington and Corless on the eve of, and in contemplation of bankruptcy. If this were true, yet the preference would not constitute an act of bankruptcy, though it would be void, as a fraud upon the general creditors; but still it would be incumbent on the plaintiffs to establish an act of bankruptcy, to entitle them to recover. It is true, that the execution issued upon the judgment which this bond authorized, might amount to an act of bankruptcy, if it was done at the request, or through the procurement of M'Claws; as if at the time he gave the bond, it was agreed that judgment should be entered up, and execution taken out and levied immediately. But if the entering up the judgment and award of execution were acts of Billington and Corless, unsolicited by M'Claws, or not agreed upon when he gave the bond, it is not an act of bankruptcy. On the one hand, the unwillingness with which M'Claws gave this security, seems to discountenance the idea of his having requested or procured what followed. On the other, considerations of benefit to his family, thrown out by Billington and Corless, might have influenced him to wish it. This, however, is a subject more proper for the decision of the jury than of the court, and therefore it is left to them to say, upon all the circumstances given in evidence, whether the taking the goods of the defendant in execution, was or was not by his procurement.

We now come to the 1st day of June, when, prima facie, an act of bankruptcy was committed. Suter was at the house of M'Claws with process, and was prevented from serving it by the house being locked up, and M'Claws within, refusing admittance to the officer. If the jury should be of opinion that this was a fair, adversary transaction, between Goodwin and M'Claws, then there is no doubt, that on the 1st of June an act of bankruptcy was committed. If on the other hand they are of opinion, that it was a concerted measure between M'Claws and Goodwin, or between M'Claws and some of his creditors, then it is not such an act as will give validity to the commission against creditors not privy to the plot, because it cannot be said that he concealed himself, so that process could not be served upon him, with intent to delay and defraud his creditors, when it was done at the request and by concert with his creditors or some of them. The circumstances attending this transaction are, that on the 31st May, in consequence of Billington and Corless' determination to proceed to the sale of M'Claws' goods, he called that day upon his principal creditors and informed them of it. The next day, Goodwin carried the officer to serve process on M'Claws. Goodwin first got to the house, and had time to apprize M'Claws of the approach of the officer, so that the door might be fastened, if it was a concerted thing. The refusal to open the door; the offer to Suter of two dollars; his suspicions and demand of eight dollars as the fee on such occasions; the implied acknowledgment of the truth of these suspicions by Goodwin, in stating that he should be paid, and referring him to M'Claws for the money, are circumstances, which, taken together, afford strong ground to suspect that the whole was a concerted business. On the other hand, as most of the suspicious circumstances passed between Goodwin and the officer, not in the presence of M'Claws, it does not follow with any degree of certainty, that M'Claws was refused in order to favour the views of Goodwin or of the creditors. Upon the whole, this is a question depending so much upon evidence, that I leave it to the jury to say, whether the transactions of the 1st of June were adversary or concerted. If the latter, the verdict must be for the defendant, unless the jury should be of opinion that the execution of the 14th January was issued and levied by the procurement of M'Claws, in which case the act of bankruptcy will defeat the execution of Billington and Corless, however legal it might be in other respects. But if the jury should be of opinion against the plaintiffs upon that point, and should think that the proceedings of the 1st of June were adversary, the plaintiffs will have established the act of bankruptcy on that day; and then it will be necessary to inquire, secondly, what legal effect it will have upon the execution of Billington and Corless of the 14th of January.

The 31st section of the bankrupt law [of April 4, 1800, 2 Stat. 30] excepts from the general mass of creditors who are to come in pari passu under the commission, those who had obtained a lien by an execution, executed upon the estate of the bankrupt previous to the act of bankruptcy. The question is, was this execution legally executed before the 1st of June? The facts are, that after the execution was levied, the goods remained in the possession of M'Claws, by the permission of Billington and Corless; and he continued to exercise every act of ownership over them, until the 31st of May or the 1st of June.

It was strongly contended at the bar, by the defendants' counsel, that if an execution be once levied, a lien attaches, which will prevail against subsequent executions and subsequent purchasers, although the property seized has been re-delivered to the debtor, has remained in his possession for any length of time, and so continued at the time of such subsequent execution or sale. I was surprised at this doctrine, but the more so when the authority of the supreme court of Pennsylvania was quoted in support of it. I should certainly examine with great caution any question decided by the learned judges of that court, before I ventured to pronounce a different opinion. Although not bound by their decisions, they are and ought to be highly respected; but if there be a question which has long since been settled and at rest; if there ever was a point settled upon correct and solid principles, it is the present; and in direct contradiction of the argument for the defendants. Nothing could be more mischievous, than to permit a dormant execution to rise up, at any distant period, to defeat a subsequent sale fairly made, or a posterior execution. And in what does an execution in the sheriff's hands differ from one which has been levied, and the property re-delivered to the debtor; enabling him thereby to acquire a false credit, and to defraud those with whom he may deal? Possession of personal property is the only indicium of property; and for this reason; if the vendor of such property remain in possession, it is fraudulent and void against creditors and purchasers. It cannot be said that an execution is really executed, where the debtor is permitted by the plaintiff to retain possession, and exercise the same acts of ownership over it which he before had done. The effect of a seizure is to change the property in the goods, and to vest it in the sheriff; but no change in this case was produced; no lien created; both were prevented by the fraud which the law implies; where the property being changed, possession remains with the former owner, and that with the consent of the person entitled. I am pleased to find that this opinion corresponds with that of the supreme court of Pennsylvania in the case of Chancellor v. Phillips, [4 Dall. (4 U. S.) 213,] although I do not yield my as-

sent to the distinction, there taken, between household furniture and other goods. The decision in the late circuit courts in the case of U. S. v. Conyngham, [Case No. 14,850,] contains a full and able investigation of this doctrine, and is in perfect unison with the English decisions, and with my opinion. But there is another objection to the title of Billington and Corless under the execution, which is equally fatal, and that is the insufficiency of the levy. The sheriff must always designate the property seized under the execution, either in the body of his return, or by reference to a schedule accompanying it. The reason is obvious; the execution creating a lien, it should be known to others who may take posterior executions, or who may deal with the debtor, what property is affected by the lien, and what is not. In this case, the return is, "levied on goods as per inventory;" but no inventory was made, or returned with the execution. As M'Claws continued from January to June to sell and buy as usual, no person can say whether any, and which of the articles sold on the 8th of June, were levied upon on the 14th January.

Upon the whole, if the jury are of opinion that an act of bankruptcy was committed by M'Claws on the 13th or 14th of January, or on the 1st of June, they must find a verdict for the plaintiffs, notwithstanding Billington and Corless' execution; if otherwise, they must find for the defendants.