**In re RAILROAD DYNAMICS,
INC., Debtor.**

**Harry B. ALTENBERG,
Trustee, Plaintiff,**

v.

**FRANKFORD TRUST CO., Defendant
and Third–Party Plaintiff,**

v.

**A. STUCKI COMPANY,
Third–Party Defendant.**

**Bankruptcy No. 84–00869S.
Adv. No. 88–0894S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

March 17, 1989.

Lawrence J. Tabas, Philadelphia, Pa., for trustee.

Stephen J. Springer, Philadelphia, Pa., for A. Stucki Co.

James M. Peck, David T. Sykes, Margery N. Reed, Philadelphia, Pa., for Frankford Trust Co.

James Adelman, Philadelphia, Pa., for debtor.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

From the complex jumble of facts surrounding Objections by a Trustee to claims of the Debtor's two major creditors and an adversary proceeding involving the Trustee and both of these creditors, all of which were consolidated for trial, emerge three rather simply-resolved legal issues. The adversary proceeding, attempting to render Frankford Trust Co. (hereinafter referred to as "Frankford") liable for its failure to sell the Debtor's tumbling stocks which it was holding as collateral in connection with the Debtor's appeal of a judgment obtained against it by A. Stucki Company (hereinafter "Stucki"), clearly lacks merit. We also conclude that Frankford's attempt to assert an administrative claim against the Debtor because the Debtor improperly received post-petition dividends on the stocks after they were liquidated by Frankford lacks merit, because we do not see how or why Frankford was the victim of the Debtor's actions. Finally, equally ill-fated is the effort of Stucki to claim secured status of its claim on the basis of its large prepetition monetary judgment against the Debtor, because it has not established that the Debtor's personalty had been validly levied upon prior to the bankruptcy filing. Therefore, we sustain the Objections to both Stucki's and Frankford's claims, and we dismiss the claims of the Trustee in the adversary proceeding, mooting the third-party claim asserted by Frankford against Stucki therein.

### B. PROCEDURAL HISTORY

The bankruptcy case underlying all of these matters was filed under Chapter 11 of the Bankruptcy Code on March 16, 1984, eight (8) days after the district court refused any further stay of a judgment entered on a Counterclaim of Stucki against the Debtor. This judgment determined that the Debtor's only business, manufacture of certain hydraulic shock absorbers utilized on railroad freight cars known as "snubbers," was violative of Stucki's patent and that Stucki was entitled to an injunction and a monetary judgment in excess of $2 million. This bankruptcy case was converted to a Chapter 7 case on September 5, 1984, and, on September 11, 1984, HARRY B. ALTENBERG, the plaintiff in the adversary proceeding and the protagonist of both of the Objections, was named interim trustee (hereinafter referred to as "the Trustee").

The present flurry of activity is the tail-end of the case. We set this process in motion by an Order of April 21, 1988, in which we not only denied a motion of a landlord of the Debtor for administrative expenses, but also directed that the Trustee file, on or before June 1, 1988, any adversary proceedings or additional Objections to proofs of claims necessary prior to

the closing of the case. Among the Objections ultimately and somewhat belatedly filed, on June 29, 1988, and July 1, 1988, respectively, were attacks upon an administrative claim in the amount of $35,180.00 filed by Frankford (No. 30) and two secured claims filed by Stucki (Nos. 26 and 38), the last, superseding one of which was in the amount of $2,000,635.00.

The adversary proceeding was filed against Frankford on July 5, 1988. Therein, the Trustee sought to recover the amount by which the Debtor's stocks held as collateral by Frankford depreciated in value between the date of the bankruptcy filing on March 16, 1984, and April 19, 1984, when Frankford liquidated them. Frankford joined Stucki as a third-party defendant, contending that it would have liquidated the stocks earlier if Stucki had not provided the only opposition to Frankford's motion seeking relief from the automatic stay to effect the disposition of the stocks.

These matters ultimately became listed on our calendar on the same date, and were continued several times until October 25, 1988, when we entered an Order that a continuance until December 6, 1988, would be the last. The consolidated trial began and consumed several hours on December 6, 1988. However, we were unable to complete it, and were obliged to schedule it for completion on January 5, 1989. At its completion, Frankford initially indicated a desire to order a transcript, but thereafter withdrew this request, allowing us to enter an Order of January 30, 1989, requiring that all three parties file Opening Briefs by February 20, 1989, and Reply Briefs by February 27, 1989. Pursuant to a request by Frankford, the length of whose briefs far exceeded that of the other parties, the date that the Reply Briefs were due was pushed back to March 1, 1989.

As the matters before us include an adversary proceeding, were are obliged, by the terms of Bankruptcy Rule (hereinafter "B.Rule") 7052 and Federal Rule of Civil Procedure (hereinafter "F.R.Civ.P.") 52(a), to present our decision in the form of Findings of Fact and Conclusions of Law. We

do so, utilizing our Conclusions of Law as headnotes for legal discussions which are presented immediately thereafter.

## C. FINDINGS OF FACT

1. On March 17, 1976, the Debtor instituted a declaratory judgment action to have Stucki's patent on snubbers, the manufacture of which was the Debtor's sole business, declared invalid. Stucki counterclaimed to enjoin the Debtor's alleged infringement of its patent and for damages.

2. On March 28, 1983, subsequent to a trial in which Stucki prevailed, the Debtor's post-trial motions were denied, and an amended judgment of $2,182,986.00 was entered by the federal district court in this district, per the Honorable Raymond J. Broderick, in favor of Stucki and against the Debtor. *See* 579 F.Supp. 353 (E.D.Pa. 1983), *aff'd*, 727 F.2d 1506 (Fed.Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984).

3. Although the Debtor filed an appeal from this judgment to the Court of Appeals for the Federal Circuit, which hears patent appeals, it did not have sufficient funds to post a supersedeas bond. Therefore, on April 8, 1983, Stucki commenced execution on its judgment by filing and serving a writ of execution upon the Debtor; serving writs of attachment and interrogatories on eight (8) banks in Philadelphia; and noticing the deposition of the Debtor's custodian of records and president.

4. The Debtor then moved the district court for a stay of execution pending appeal without the necessity of posting a supersedeas bond. On April 12, 1983, in response to an informal request from Judge Broderick, Stucki agreed to a voluntary stay of execution pending a hearing on the Debtor's motion.

5. On April 29, 1983, after the hearing, Judge Broderick entered an Order granting the Debtor's motion subject, *inter alia*, to the following terms and conditions:

1. *Within* seven (7) days of the date of this Order, [the Debtor] shall post security in the form of a bond executed by an

approved corporate surety in the amount of $1,100,000

. . . . .

2. [The Debtor] shall take all necessary steps to maintain the value of its assets and prevent a decrease in the value thereof....

6. To satisfy these conditions of the Stay Order, the Debtor obtained a standby letter of credit in the amount of $1.1 million from Frankford in favor of the Insurance Company of North America (hereinafter "INA"), which posted the necessary security bond.

7. As security for the issuance of the letter of credit, the Debtor signed a promissory note in favor of Frankford in the amount of $1.1 million with interest. The Debtor also entered into security agreements with Frankford granting to Frankford a first priority perfected security interest in virtually all of the Debtor's assets, including 52,000 shares of Duquesne Power and Light Co. and 20,000 shares of Detroit Edison Co. stock. The Debtor delivered the stock certificates and signed stock powers giving Frankford the right to, *inter alia,* sell the stock or replace it with other securities if it depreciated in value.

8. On May 12, 1983, the stock had a market value in excess of $1,230,000.00. However, the stock, though fluctuating, suffered an overall decline in value thereafter. Consequently, on February 2, 1984, Frankford required the Debtor's president, Stuart Schwam, and his wife, to furnish additional securities and assign two $100,-000 certificates of deposit and certain money market and demand deposit accounts to Frankford as additional collateral for the letter of credit.

9. On January 25, 1984, the Court of Appeals for the Federal Circuit affirmed the district court's judgment. *See* 727 F.2d 1506 (Fed.Cir.), *cert. denied,* 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984). On March 8, 1984, after remand, Judge Broderick granted Stucki's motion for an injunction to prohibit the Debtor's further infringement of Stucki's patent and denied the Debtor's motion for a further stay pending consideration of its ultimately-un-successful petition for certiorari to the United States Supreme Court.

10. On March 19, 1984, three days after filing this bankruptcy case, the Debtor unsuccessfully filed an emergency application with this court, per our predecessor, the Honorable William A. King, Jr., to enjoin Frankford from paying INA under its letter of credit and to enjoin INA from paying Stucki under the appeal bond. Accordingly, Frankford paid $1.1 million to INA under the letter of credit, and INA in turn paid Stucki this sum pursuant to its bond.

11. Frankford correctly concluded that it could not liquidate the collateral to satisfy the Debtor's obligations without first obtaining relief from the automatic stay imposed by 11 U.S.C. § 362(a) of the Bankruptcy Code. It therefore filed an expedited motion for relief from the stay and, on March 20, 1984, this court ordered that a Stipulation agreeing to modify the stay would be approved if no objections to it were filed on or before March 30, 1984.

12. On March 27, 1984, Stucki filed numerous motions in an effort to stop the Debtor's entire case from going forward, including a motion to withdraw the reference of the entire bankruptcy case to the district court and a motion to stay the entire bankruptcy proceedings. In addition, Stucki filed an objection to the Stipulation to allow Frankford relief from the stay on that date.

13. Because of Stucki's filing, which was the only Objection to the Stipulation, a hearing on the Stipulation was scheduled and not heard until April 18, 1984. At the hearing, Judge King approved the Stipulation and dismissed Stucki's Objection.

14. On April 19, 1984, the day immediately following the approval of the Stipulation, Frankford sold the stock through the brokerage firm of Kidder Peabody & Co. (hereinafter "Kidder"). The proceeds of the sale of the stock overall were only $924,928.99, due to the overall depreciation of the stock from May 12, 1983, to March 18, 1984. This depreciation had continued between March 16, 1984, and April 19, 1984.

15. Even though Frankford had sold the stock in April, the Debtor was errone-

ously issued dividend checks in July, 1984, from Duquesne Power and Light Co. in the amount of $26,780.00 and from Detroit Edison Co. in the amount of $8,400.00.

16. Since the stock had been transferred before the dividend date and hence he correctly believed that the Debtor had no right to receive dividends, Schwam testified that he nevertheless deposited the dividend checks in the Debtor's bank account, which was ultimately included in a balance of approximately $600,000 turned over to the Trustee because he was unsure what to do with them. Schwam testified that the funds in the account had been used for the administration of the Debtor's estate in the interim, but there is no evidence when and if the particular funds received from the dividend checks were used.

17. Frankford's vice-president in charge of its investment department testified that he believed that Kidder had erroneously failed to transfer the stock to the new owners, thus causing the dividends to be sent to the Debtor. Nevertheless, he stated that Kidder had made a claim for the full amount of the dividends plus interest against Frankford and had set off the entire sum against Frankford's account with it.

18. Frankford's house counsel, however, clarified that Kidder had in fact only set off approximately $10,000 against its account as the result of these events. Counsel also indicated in a letter to Schwam of January, 1985, that litigation between it and Kidder over this matter was "imminent." However, there has been no such litigation filed to date.

19. The proof of claim of Frankford, in the amount of $35,180.00, reflects the sum of the dividends which were wrongfully paid to the Debtor.

D. CONCLUSIONS OF LAW/DISCUSSION

1. THIS COURT HAS JURISDICTION TO HEAR AND DETERMINE ALL OF THE MATTERS PRESENTED HEREIN.

 There is, apparently, no dispute that this court has jurisdiction to hear and determine all aspects of the instant matters, as they are all core proceedings. 28 U.S.C. § 157(b)(1). Clearly, the objections to proofs of claim are core proceedings. 28 U.S.C. § 157(b)(2)(B). We also believe that the adversary proceeding is core in nature, because it involves post-filing conduct of Frankford which relates directly to the administration of the Debtor's estate. 28 U.S.C. §§ 157(b)(2)(A), (b)(2)(O). *See In re Arnold Print Works, Inc.*, 815 F.2d 165, 168–71 (1st Cir.1987); and *In re Jackson*, 90 B.R. 126, 128–31 (Bankr.E.D.Pa.1988). We shall, therefore, proceed to enter a final Order as to all of these matters.

2. THE TRUSTEE HAS PROVIDED SUFFICIENT EVIDENCE IN THIS RECORD TO REQUIRE BOTH CLAIMANTS TO PROVE THE VALIDITY AND/OR PROPER CLASSIFICATION OF THEIR CLAIMS BY A PREPONDERANCE OF THE EVIDENCE.

 Much of Frankford's Briefs on the issue of the validity of its proof of claim as filed is devoted to a contention that it should prevail because the Trustee failed to present any evidence to support his objection to its claim. Evidence was presented in the consolidated hearings first by Stucki; then by the Trustee; and, lastly, by Frankford. While the Trustee did not call any witnesses, we disagree with Frankford's contention that he failed to present any evidence relevant to his objections to its claim, or to Stucki's claim, for that matter. Rather, since the Trustee knew that both Stucki and Frankford intended to call witnesses which would support their respective claims and positions in the adversary proceedings, and attempt to attack the claims of the other, he properly deferred to each of them to present their own evidence both in support of their claims and in opposition to the other.

In determining which of the scenarios set forth in *In re Lewis*, 80 B.R. 39, 40–41 (Bankr.E.D.Pa.1987), was manifested by this sequence of presentation of evidence,

it is clear that we must focus upon the record made at the hearing as a whole. Frankford (and Stucki) opted to present considerable evidence which they believed supported the validity of their respective claims. The Trustee apparently concluded that the evidence presented by Frankford and Stucki not only failed to succeed in supporting their claims, but tended to undermine them. In retrospect, this conclusion appears to be accurate. However, it is clear that the testimony presented, whether from the mouths of witnesses called by Frankford or by Stucki or by the Trustee, was evidence submitted on the Trustee's behalf at the hearing.

Therefore, clearly, the record on the proofs of claim must be considered to fall within the fifth scenario set forth in *Lewis*, 80 B.R. at 41. It is only a record in which, taking all of the evidence into account, there is no evidence to support the objector's position anywhere in the record in which the third scenario, or the "relatively uncommon" situation in which the claimant only presents evidence which supports the claim, arises. 80 B.R. at 41 & n. 1. As we pointed out in *In re Jordan*, 91 B.R. 673, 683–84 (Bankr.E.D.Pa.1988), it is virtually impossible for the objector to prove a negative, *i.e.*, that a claim has no merit, when the objector is uncertain of the basis of the claim. Any evidence from any source tending to raise a question concerning the validity of the claim is therefore sufficient to put the claimant to his proof.

We therefore conclude that, as to the objections of the Trustee to the proofs of claims, the record, as a whole, clearly contains sufficient evidence to place upon the respective claimants the burden of proving their claims by a preponderance of the evidence. *See, e.g., Jordan, supra*, 91 B.R. at 683–84; *In re Celona*, 90 B.R. 104, 109 (Bankr.E.D.Pa.1988); and *In re BRI Corp.*, 88 B.R. 71, 73 (Bankr.E.D.Pa.1988) (TWARDOWSKI, CH. J.).

### 3. STUCKI HAS FAILED TO PROVE THAT THERE WAS A VALID LEVY ON ANY OF THE DEBTOR'S PERSONAL PROPERTY; ITS STATUS IS THEREFORE THAT OF AN UNSECURED CREDITOR.

The only facts presented by Stucki in support of its contention that its claim should be accorded secured status are that (1) it filed a writ of execution, and (2) commenced certain discovery in aid of execution, *see* Finding of Fact 3, page 241 *supra*, between April 8, 1983, and April 12, 1983, because (3) it ceased these proceedings only at the specific request of Judge Broderick. The only other period of time in which it *could* have proceeded to execute upon its judgment was between March 8, 1984, when Judge Broderick refused to extend the stay after the unsuccessful appeal to the Federal Circuit, and March 16, 1984, when the Debtor filed bankruptcy. There is no evidence that any execution proceedings were effected during the latter period.

Stucki accurately cites *In re Decker*, 27 B.R. 184, 185–86 (Bankr.M.D.Pa.1983), for the principle that, *if* a creditor effects a valid levy on a debtor's personalty prior to a bankruptcy filing, then the creditor has created a lien which renders the creditor's claim secured by the property levied upon.[1]

---

1. Stucki, however, attempts to carry this principle too far, and contends that a valid levy against a debtor's property would remove that property from the category of "property of the debtor's estate," citing, as support for this principle, *Mid–Jersey Nat'l Bank v. Fidelity–Mortgage Investors*, 518 F.2d 640, 642–44 (3d Cir.1975). *Mid–Jersey* does hold that, under the Bankruptcy Act, which was superseded by the Bankruptcy Code, the automatic stay did not extend to property levied upon but on which the levy was stayed by a supersedeas bond. However, as the Supreme Court unanimously held in *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 210 n. 18, 103 S.Ct. 2309, 2316 n. 18, 76 L.Ed.2d 515 (1983), the preposition that effectuation of a lien on property places that property beyond the bankruptcy court's jurisdiction "is now irrelevant because of the expanded jurisdiction of bankruptcy courts under the Bankruptcy Code." Therefore, in *Whiting Pools*, the Court held that property which had even been physically seized by the Internal Revenue Service pursuant to a lien prior to the debtor's bankruptcy filing was nevertheless property of the debtor's estate under the Code. 462 U.S. at 204–05, 103 S.Ct. at 2313. *Accord, e.g., In re Koresko*, 91 B.R. 689, 695–96 (Bankr.E.D.Pa.1988); and *In re Ford*, 78 B.R. 729, 734–37 (Bankr.E.D.Pa.1987). This erroneous assessment of its rights by Stucki apparently led to its misplaced and un-

However, the difficulty with the application of that principle to the facts here is that Stucki has not established that a valid levy on any of the Debtor's personal property was ever effected.

Pursuant to B.Rule 7069 and F.R.Civ.P. 69(a), the execution procedures in the local district court in issue here must be undertaken in accordance with the law of Pennsylvania. It is well-established, under Pennsylvania law, that a judicial officer effecting a levy must bring personalty levied upon "within the actual power of the court." 12 STANDARD PA.PRAC.2d 453 (1983). This can be accomplished, in the absence of extraordinary circumstances which actively prevents a judicial officer from doing so, only by manual seizure of the property levied upon by the judicial officer, or by the officer's viewing the property and following up the view by taking actual possession of the property within a reasonable time thereafter. *Id.* at 454–55. *See, e.g., Trainer v. Saunders,* 270 Pa. 451, 453, 113 A. 681, 682 (1921); *Dixon v. White Sewing Machine Co.,* 128 Pa. 397, 405, 18 A. 502, 502 (1889); *Duncan's Appeal,* 37 Pa. 500, 502–03 (1861); and *Commonwealth v. Weglein,* 147 Pa.Super. 257, 260, 24 A.2d 633, 636 (1942). If the levy is not validly effected, no lien arises and the purportedly-secured creditor has no security interest which is prior to the claim of a trustee on behalf of general unsecured creditors. *Barnes v. Billington,* 2 F.Cas. 858, 861–62 (D.Pa.1803) (No. 1,015).

Since the burden is upon Stucki to prove the validity of its secured claim by a preponderance of the evidence, we must conclude that Stucki has failed to meet its burden of establishing that any of the property of the Debtor was validly levied upon by the United States Marshal. No marshal's return showing that any of the Debtor's personalty was in fact levied upon was produced. We note that, to validly levy on the Debtor's stock, it was necessary that the marshal actually seize same. 13 Pa. C.S. § 8317(a); and 12 STANDARD PA.

PRAC.2d, *supra,* at 455–56. This was obviously not accomplished, as Frankford remained in possession of the stock at all pertinent times. Other than the docket entries of the district court proceeding, which are totally inconclusive as to the actions of the marshal to effect a levy, the only evidence touching upon the execution proceedings is the testimony of Stucki's counsel, Raymond Hasley, Esquire. Mr. Hasley expressly disclaimed any knowledge of the efforts undertaken by the marshal to effect a levy on any of the Debtor's property.

We therefore conclude that Stucki has failed to meet its burden of establishing that it had a valid execution, a valid levy, or a valid lien against the Debtor's personalty, as would be necessary to sustain secured classification of its claim. As the only objection of the Trustee to Stucki's Amended Proof of Claim, which superseded its earlier claim, is the improper classification of the claim as secured, we shall allow Stucki one claim in the amount of $2,000,-635.00, as a general unsecured claim.

### 4. FRANKFORD HAS FAILED TO PROVE THAT IT HAS A VALID ADMINISTRATIVE CLAIM AGAINST THE DEBTOR'S ESTATE, AS IT IS NOT CLEAR THAT THE DEBTOR'S ERRONEOUS RECEIPT OF THE DIVIDEND CHECKS IN ISSUE WAS AT FRANKFORD'S EXPENSE.

A closer and rather provocative issue is presented by Frankford's attempt to assert an administrative claim against the debtor in the amount of $35,180.00, representing the dividends which were erroneously paid to the Debtor and retained by it. As we indicated at pages 243–44 *supra,* we are unconvinced by the main thrust of Frankford's argument, *i.e.,* that the purported failure of the Trustee to present evidence requires us to sustain its claim. We believe, instead, that the burden is thrust upon Frankford to establish that *it* (as opposed to any other party) had a

fortunate opposition to Frankford's totally proper conclusion in March, 1984, that it was

obliged to obtain relief from the stay before liquidating the Debtor's stock.

valid administrative claim against the Debtor.

Frankford's basis for priority classification of its claim is founded upon 11 U.S.C. § 507(a)(1), which establishes that "administrative claims allowed under section 503(b) of this title" are entitled to a first priority. The particular provision of 11 U.S.C. § 503(b) relied upon by Frankford is § 503(b)(1)(A), which provides as follows:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
>
> > (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case: ...

We have repeatedly expressed our policy of " 'keeping administrative costs to a minimum' " and therefore reading § 503(b)(1) narrowly to "embrace only those items clearly allowed by statute." *In re American International Airways, Inc.*, 77 B.R. 490, 494 (Bankr.E.D.Pa.1987) (hereinafter cited as *"AIA"*), citing and quoting *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 891, 897 (Bankr.E.D.Pa.1987). *Cf. In re St. Mary Hospital, Velez v. St. Mary Hospital*, 97 B.R. 199, 203–04 (Bankr. E.D.Pa. 1989) (11 U.S.C. §§ 503(b)(3)(D) and (b)(4) must be narrowly construed).

We recognize that a debtor's post-petition misappropriation of funds may justify the imposition of an administrative claim against a debtor in favor of the party suffering a monetary loss by reason of the misappropriation. *See AIA, supra,* 77 B.R. at 491–92 (district court rules that debtor's post-petition presentation of bad checks to recover credit-card slips paid for by collecting agent entitles the collecting agent to "super-super-priority claim" status).

We believe a rather closely analogous contention to that of Frankford was stated by the Internal Revenue Service (hereinafter "IRS"), in *In re Motor Freight Express*, 91 B.R. 705, 712 (Bankr.E.D.Pa. 1988), *appeal dismissed,* 94 B.R. 346 (E.D. Pa.1988) (hereinafter cited as *"MFX"*). There, the IRS sought to recoup an erroneous, post-petition tax refund which it allegedly remitted to the debtor. We stated that "[c]learly, property stolen or improperly received by a debtor during a bankruptcy cannot be retained by a debtor on the ground that it is property of the estate." *Id.* However, we also recognized, in that Opinion, a contrary policy of "distaste for a creditor's contentions that it is required to receive favored treatment in distribution of estate assets." *Id.* at 713. We were ultimately disinclined to grant the request of the IRS that the funds be turned over to it on the merits of its claim[2] because the IRS failed to establish, by production of a cancelled check, that the check for the erroneous refund was ever paid to the debtor, and hence that the IRS actually suffered a loss by reason of the debtor's alleged improper receipt of funds. *Id.* at 712.

It is clear that, unlike the debtor in *MFX*, the Debtor here did actually receive a financial windfall to which it was not entitled. It thus obtained funds within the potential scope of § 503(b)(1)(A), because, if these funds did not necessarily preserve the Debtor's estate financially, they certainly enhanced it. However, it is *not* clear why *Frankford* should be considered the victim of the Debtor's windfall and entitled to an administrative claim as a result. Frankford was simply acting as the Debtor's agent in selling the stock and, according to its witnesses' testimony, it performed its duties properly. The testimony of Frankford's witnesses clearly supports the conclusion that Kidder or some other party negligently failed to advise the companies in which the stock was held to send the dividends elsewhere than to the Debtor. Certainly, if the buyer of the stock did not receive dividends to which it was entitled, it would appear to have a claim against the

---

**2.** The basis for the decision was, however, procedural. The IRS had earlier failed to establish that its claim should be classified higher than a seventh priority, and we found that it had failed to produce the requisite "cause" to have us reconsider our prior classification determination. 91 B.R. at 709–11.

Debtor. Likewise, the companies in which the stock was held, if compelled to pay the dividends twice, would appear to have had a justified claim against the Debtor. If Kidder, because of its negligence, was compelled to reimburse the companies or the buyer, it would appear to have a legitimate claim. However, it is unclear why Frankford, whose losses resulted solely due to Kidder's improper attempt to effect a set off against it, *see Limbaugh v. Merrill, Lynch, Pierce, Fenner, & Smith, Inc.*, 732 F.2d 859, 863–65 (11th Cir.1984) (broker has no right to set off amount of dividends improperly received by seller against his account), would have a claim against the Debtor. It is *totally* unclear why Kidder would set off only approximately $10,000 against Frankford in any event. We are unfavorably impressed by the misleading testimony of Frankford's vice-president, even if *innocently* misleading, that Kidder had set off the entire $35,180 sum of the dividends. Had Frankford's house counsel not set the record straight on this point, we would have been misled. We also consider it extremely strange that, over the intervening period of four and a half years, Frankford and Kidder have apparently been unable or unwilling to resolve their rights *inter se* in this matter.

Our difficulty is therefore not that some party may not have a good claim, entitling it to some sort of priority against the Debtor for the wrongfully-received dividends. Rather, it is ascertaining why Frankford should be that party. It would seem to us that Kidder or whoever is ultimately actually out of pocket for the $35,180.00 that was sent to the Debtor should be making this claim. Clearly, Frankford is entitled to no more than the "approximately $10,-000" set off against it. Failing to understand why this sum was set off, we are, frankly, suspicious of Frankford. We fear that, by awarding this entire sum or even a part thereof as an administrative claim to Frankford, which should not be liable for any of it, we would merely providing Frankford with a windfall to which *it* is not entitled.

In *AIA*, there was no question that that claimant-collection agent was the direct and only victim of the Debtor's defalcation. In *MFX*, where a question arose as to whether the IRS has suffered a loss as a result of the Debtor's receipt of the funds to which it was not entitled, we ruled against the IRS. Here, due to the confusion between the testimony of its own witnesses, we are unable to conclude with any degree of certainty that Frankford suffered a loss of $35,180.00, or any ascertainable sum, as a result of the Debtor's receipt of the dividends. Given the policy of keeping administrative costs at a minimum, we are not prepared to allow Frankford any claim of this sort in the face of such uncertainty.

Frankford has therefore failed to convince us that the preponderance of the evidence supports the allowance of its claim. There is no basis other than § 503(b)(1)(A) cited to us as support for the allowance of this clearly post-petition claim against the Debtor's estate. We therefore shall sustain the Trustee's Objections thereto and strike the claim.

5. THE CLAIMS ASSERTED IN THE ADVERSARY PROCEEDING AGAINST FRANKFORD ARE TOTALLY WITHOUT MERIT AND MUST BE DISMISSED.

The Trustee, in a display of sound discretion, virtually abandons the adversary proceeding in his briefing, stating, without embellishment and with a somewhat less impressive display of discretion, that he "adopts" Stucki's discussion on these issues. Stucki, in its Brief, ignoring entirely the recitations in the Complaint, which assert no such claims, argues that Frankford is liable to the estate for all of the losses in the value of the stock *from April 29, 1983* (the date of Judge Broderick's stay order), *to April 19, 1984* (the date of the disposition of the stock), on the grounds that: (1) It breached a duty to preserve the Debtor's assets by not selling the stock sooner, which it had the power to do; and (2) It received preferential transfers in demanding and receiving replacement collateral from Schwam and his wife when the stock declined in value.

The abrupt departure of Stucki from the allegations of the complaint, which it will be recalled alleged only a breach of duty on the part of Frankford in failing to liquidate the stock in the post-petition period from *March 16, 1984, through April 19, 1984,* appears to have been motivated by its careful consideration of our statement, in the course of the trial, that we believed that the stock, contrary to the earlier assertions of Stucki, were property of the Debtor's estate, and that Frankford had proceeded properly in obtaining relief from the stay before proceeding to sell them.[3] However, by failing, at any time, to have the Trustee so much as seek to amend the original Complaint, either by formal motion or even orally in the course of the trial, we believe that the Trustee, and Stucki taking his part, are barred from seeking recoveries for damages never sought, based on theories never raised, in the pleadings. *See Evans Products Co. v. West American Ins. Co.,* 736 F.2d 920, 922–24 (3d Cir.1984).

Furthermore, the theories articulated by Stucki are, in any event, far-fetched. According to Stucki, Frankford had the responsibility to determine whether the value of the Debtor's stock would decline, and, if it did, to dispose of it. It should be noted that, although the value of the stock did decline overall, the values fluctuated throughout the period. There was no evidence that Frankford knew or should have known that the value of the stocks *would* decline or that any interested party, most notably the Debtor or Stucki, ever *requested* that Frankford sell the stocks for this or any other reason. We believe that one or both of these elements would have had to have been established to even possibly support the merits of this claim. Frankford cannot be held in the role of an insurer against the vagaries of the stock market.

Being unable to articulate any theory which would create a duty on the part of Frankford to effectively have served as the Debtor's investment manager as to the stock, Stucki attempts to argue that, by failing to sell the stock, Frankford may be declared in *contempt* of that portion of the district court's Order of April 29, 1983, requiring the Debtor "to maintain the value of its assets and prevent a decrease in the value thereof!" Support for the principle that a person not a party to an Order may be adjudged in contempt thereof is found in *Quinter v. Volkswagen of America,* 676 F.2d 969, 972–74 (3d Cir.1982) (witness held in contempt for sharing materials with an attorney in relation to other similar litigation in direct violation of a protective order). Not recited are the following passages from *Quinter, id.,* at 974 (same witness not held in contempt for holding the materials before the camera, but not reading their contents, on a nationally-televised news commentary show):

> "The plaintiff has a heavy burden to show a defendant guilty of civil contempt. It must be done by 'clear and convincing evidence,' and where there is ground to doubt the wrongfulness of the conduct of the defendant, he should not be adjudged in contempt." (quoting *Fox v. Capitol Co.,* 96 F.2d 684, 686 (3d Cir. 1938)).

*See also, e.g., United States v. Norton,* 717 F.2d 767, 774 (3d Cir.1983) ("a party should not be held in contempt unless the court first gives a fair warning that certain acts are forbidden; any ambiguity in the law should be resolved in favor of the party charged with contempt").

It is far, far from clear that Frankford had any warning that any act on its part would or could result in its being held in contempt of the Order of April 29, 1983,— or that its agents were even aware of the Order. To conclude that there was ambiguity as to whether Frankford violated this Order is an understatement. Suffice it to say that we find no act of Frankford to be legally improper, even in light of this Order, much less contemptuous of it.

The assertion that an action to recover the pre-petition additional advances of Schwam and his wife to Frankford as pref-

---

**3.** *See* pages 244–245 n. 1 *supra,* where we discuss and dispose of the merits of Stucki's claim in this regard.

erential, under 11 U.S.C. § 547(b), is, if anything, even more problematical than Stucki's other assertions, for several reasons. First, this claim is not even remotely close to the cause of action stated in the Complaint. Secondly, as Frankford points out, a preference action would be barred by the two-year statute of limitations contained in 11 U.S.C. § 546(a)(1), because the Trustee was appointed on September 5, 1984, almost four years before this proceeding was filed. Thirdly, the "preferences" attacked are transfers made by *Schwam and his wife,* to shore up the collateral. They were not transfers "of an interest of the *debtor,*" as required by 11 U.S.C. § 546(b). Finally, the record contains no evidence that the elements set forth in 11 U.S.C. §§ 547(b)(3) or (b)(5) were present. *Compare In re E & S Comfort, Inc.,* 92 B.R. 616, 619–20 (Bankr.E.D.Pa. 1988) (failure of trustee to prove the element of § 547(b)(5) is fatal to a preference action despite the probability that this element could have been proven had the burden to do so been undertaken).

Therefore, we can readily conclude that the claims set forth in the adversary proceeding, and raised by Stucki in its Briefs despite their absence from the pleadings, are in any event without merit. Since the principal claim set forth against Frankford in this proceeding, must be dismissed, the third-party complaint stated by Frankford against Stucki falls as well. We should observe that, had any merit in the claims originally set forth in the Complaint been established, we would have been distinctly inclined to have ruled in favor of Frankford on the third-party Complaint.

## E. CONCLUSION

For the reasons set forth herein, the Trustee's Objections to the Proofs of Claim filed by Frankford and Stucki will be sustained, but his adversary Complaint will be dismissed. In our Order, we also follow up our Order of April 21, 1988, and direct the Trustee to file the papers necessary to conduct a Final Audit hearing and, thereafter, make the other filings necessary to bring this case to a close.

## ORDER

AND NOW, this 17th day of March, 1989, after a consolidated trial on (1) the Objections of the Trustee, HARRY B. ALTENBERG, to the Proof of Claim of FRANKFORD TRUST COMPANY (hereinafter "Frankford"), Claim No. 30, and Proofs of Claim of A. STUCKI CO. (hereinafter "Stucki"), Claims No. 26 and 38; and (2) the above adversary proceeding on December 6, 1988, and January 5, 1989, and upon consideration of the Briefs and Reply Briefs of the parties, it is hereby ORDERED AND DECREED as follows:

1. The Trustee' Objections to Frankford's Claim (No. 30), are SUSTAINED. Frankford's proof of claim is therefore STRICKEN.

2. The Trustee's Objections to Stucki's Claims (Nos. 26 and 38) are SUSTAINED. Stucki is determined to have one general, unsecured claim in the total amount of $2,000,635.00.

3. The Complaint of the Trustee against Frankford in the adversary proceeding is DISMISSED. Accordingly, the third-party Complaint of Frankford against Stucki is DISMISSED as well.

4. The Trustee or his counsel shall file the papers necessary to conduct a Final Audit hearing in this case on or before May 1, 1989.

5. A Final Audit hearing shall be conducted on

TUESDAY, JUNE 6, 1989, at 10:00 A.M. in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

6. The Trustee or counsel for the Trustee shall submit an Order for Distribution on or before August 1, 1989, and shall thereafter file the cancelled checks and zero bank statement; or an affidavit, pertaining to disbursements made pursuant to the Order of Final Distribution, setting forth that there is a zero balance in the account and that the cancelled checks are no longer available, on or before October 1, 1989.