**In re B. COHEN & SONS CATERERS, INC., Debtor.**

**B. COHEN & SONS CATERERS, INC., Plaintiff,**

**v.**

**NEW PLAN REALTY TRUST, Marvin Fives, and Marvin Fives Food Equipment Corp., Defendants.**

**Bankruptcy No. 87–04917S.**
**Adv. No. 88–2049S.**

United States Bankruptcy Court, E.D. Pennsylvania.

March 24, 1989.

**809**

Paul Breen, Philadelphia, Pa., for debtor.

Daniel P. Bernstein, Philadelphia, Pa., for Marvin Fives.

Robert C. Perry, Mark E. Kogan, Philadelphia, Pa., for New Plan Realty Trust.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant proceeding presents two disturbing elements which, to a degree, counteract one another. First, we have a landlord who, having obtained relief from the automatic stay only to regain possession of its premises, proceeded to seize, destroy, and otherwise dispose of the Debtor-tenant's apparently valuable property despite the Debtor's vigilance in seeking to remove the property itself. This conduct constituted a flagrant violation of 11 U.S.C. §§ 362(a)(3) and (a)(6), punishable under § 362(h), and numerous violations of applicable state law. However, it also presents a Debtor who, in Schedules that to this date have not been amended, has assigned a value to the property in issue of no more than $16,500.00 even though it now claims that the actual value was over $400,000.00. We therefore determine that we must value the damages to the Debtor at the low end of the valuations which appears in the record, i.e., $50,000.00. We also add punitive damages of $10,000.00, plus an elimination of any potential claim by the Landlord against the Debtor for back rent; a directive that the Landlord return any property of the Debtor that it is holding; and attorneys' fees to the Debtor's counsel.

### B. PROCEDURAL HISTORY

The underlying Chapter 11 bankruptcy case was filed by the Debtor-in-possession, B. COHEN & SONS CATERERS, INC. (herein referred to as "the Debtor"), on September 30, 1987. On October 5, 1987, the remaining Defendant in this proceeding, NEW PLAN REALTY TRUST, the landlord at the Debtor's former place of business (and herein referred to as "the Landlord") in Store 4–L of the Roosevelt Mall Shopping Center, 2329 Cottman Avenue, Philadelphia, Pennsylvania (hereinafter referred to as "the Premises"), filed a motion seeking relief from the automatic stay in reference to the Premises. On October 28, 1987, the parties entered into a Stipulation resolving this motion which stated that the stay was modified to permit the Landlord "to regain possession of the demised premises." Additional terms included an agreement that no execution would transpire until December 31, 1987, as long as the Debtor made certain rental payments and agreed to vacate the Premises by December 31, 1987, unless a new agreement allowing it to stay thereafter was reached. The Stipulation was, for reasons unknown to us, not approved by this court until December 4, 1987.

The next significant event in this case was the Debtor's belated filing of its Schedules and Statements on July 19, 1988. These have never been amended.

One of the two principals of the Debtor, Alexander Cohen (hereinafter "Alexander"), thereafter entered into a lease with the Landlord in his own name in order to operate the business on the Premises, which extended from January 1, 1988, to June 30, 1988. Perhaps motivated by an inability to keep up the rental payments under this lease, Alexander filed a Chapter 13 bankruptcy case of his own on May 17, 1988, at Bankruptcy No. 88–11701S. On May 24, 1988, the Landlord filed a motion for relief from the automatic stay in that case, which was resolved by a Stipulation dated June 23, 1988, and approved by this court on June 24, 1988. That Stipulation modified the stay as to him, also to permit the Landlord "to regain possession of the

demised premises." However, execution was to be stayed until June 30, 1988, provided that Alexander made a $17,000.00 payment and allowed the Landlord's pre-petition rent to be paid under his Plan. The Stipulation also recites that Alexander's "interest in the premises is possessory only" and that he "has no other interest in the devised premises that could be subject to Sections 365 or 541 of the Bankruptcy Code."

On July 7, 1988, the Debtor commenced an adversary proceeding against the Landlord, at Adv. No. 88–0896S, to obtain a turnover of the Debtor's personalty at the Premises, which the Landlord was allegedly wrongfully detaining subsequent to the termination of the lease on June 30, 1988. This proceeding was settled by a Stipulation executed on August 12, 1988, and approved by this court on August 18, 1988. The terms of that Stipulation included the following:

2. [The Landlord] shall, upon the execution of this Stipulation, release to the debtor all of the personal property of [the Debtor] and of [Alexander], which it has in its possession at [the Premises], and elsewhere, under the following conditions:

(a) The parties hereto shall jointly inventory the property delivered to the debtor, and each shall receive a complete inventory record.

(b) The property shall be stored by the debtor at 728 Philadelphia Pike, Wilmington, Delaware 19803.

(c) The property shall remain under the jurisdiction of and subject to the order(s) of this Bankruptcy Court.

(d) In the event a Trustee is appointed in this case, the debtor shall deliver its property to the Trustee forthwith.

(e) The cost of removal and storage of the property shall not be the responsibility of New Plan Realty Trust. All fixtures presently in store number 4–A, [sic-it was 4–L] Roosevelt Mall Shopping Center, Philadelphia, Pennsylvania, are the property of New Plan Realty Trust to be disposed of as they see fit.

On August 31, 1988, the Debtor commenced the instant adversary proceeding, seeking $275,000.00 compensatory damages and unspecified punitive damages and attorneys' fees. The Debtor's cause of action was based upon 11 U.S.C. § 362(h), and it alleged that the defendants had violated the automatic stay by selling and disposing of the Debtor's personalty and its records. Named as defendants were the Landlord; MARVIN FIVES (hereinafter "Fives"), hired as an agent by the Landlord to dispose of the Debtor's property; and a business owned by Fives, MARVIN FIVES FOOD EQUIPMENT CORPORATION.

Fives and his corporation answered, although the parties all ultimately agreed that the matter would be dismissed as to the Fives defendants upon their payment into escrow of $10,697.00, the proceeds received by Fives from his sales of the Debtor's property at the Premises. The Landlord filed an Answer which included a Counterclaim "in excess of $270,000.00," arising from an alleged administrative claim for post-petition "costs and expenses of preserving" property of the Debtor's estate.

In contrast to the prior matters, the dispute between the Debtor and the Landlord was *not* settled, but required a trial of January 10, 1989. At the conclusion of the trial, no party having requested a transcript, we set the dates for the parties' filings of proposed Findings of Fact, Conclusions of Law, and Memoranda of Law on February 7, 1989 (the Debtor), and February 24, 1989 (the Landlord).

On February 25, 1989, we granted the Landlord's motion to reopen the record to admit a copy of a writing entitled "Sheriff's Levy," dated May 2, 1988. This document had been issued in the process of execution of a judgment in favor of the Plaintiff in the amount of $89,663.26 in the case of *New Plan Realty Trust v. Alexander Cohen c/o The Doral*, March Term, 1988, No. 2481, in the Court of Common Pleas of Philadelphia County. The "Sheriff's Levy" form recited that the sheriff had levied upon "Appx 200 chairs, 2 sofas tables, 2 Desks File Cabinets etc. TV Entire

Contents & All Business Goods" at the Premises. We also ordered our own copy of the transcript, filed February 21, 1989, and granted the Landlord, in our Order of February 25, 1989, a requested extension until March 13, 1989, to present its post-trial submissions.

Pursuant to Bankruptcy Rule (hereinafter "B.Rule") 7052 and Federal Rule of Civil Procedure 52(a), we are obliged to submit our decision in the form of Findings of Fact and Conclusions of Law. Many of the pertinent facts are the contents of undisputed court documents, which have already been recited, will not be repeated, and will be supplemented hereinafter by recitation of additional Findings of Fact gleaned from testimony adduced at the trial. Our legal conclusions are recited as headnotes to the Discussion of legal issues which follows each headnote.

## C. FINDINGS OF FACT

1. The Debtor conducted its business, as Doral Caterers, from the Premises for 23 years. After the Debtor's lease was terminated, Alexander entered into a supplemental lease, through June 30, 1988, at the same premises on presumably the same terms. The lease, although not admitted into evidence, apparently called for monthly rental payments of approximately $24,000.00.

2. The Premises constituted over 23,000 square feet of space on two floors, including a fully equipped kitchen, a ballroom or banquet room, a chapel for weddings, a lobby, an office and a changing room on each floor, having a total capacity of approximately 2,000 people. The Debtor's business was in-house catering of weddings, barmitzvahs, and dinners.

3. The Landlord is a Massachusetts business trust, authorized to do business in the Commonwealth of Pennsylvania, with its principal place of business located at 1120 Avenue of the Americas, New York, New York, and which owns and operates, in addition to the Roosevelt Mall Shopping Center in the northeast section of Philadelphia, Pennsylvania, several other shopping centers.

4. The sole principals of the Debtor are Alexander, its President, and his wife, Helen Cohen (hereinafter "Helen"). Of these two parties, only Helen testified at the trial. Helen testified that she was responsible for the purchase all of the furnishings, supplies, and equipment used by the Debtor, by which the entire facility was, per photographs admitted into evidence, tastefully and lavishly furnished. She testified that the value of the Debtor's personal property, as of July 1, 1988, was approximately $400,000.00, pursuant to an inventory of alcoholic beverages and other personalty at the Premises prepared by her and an employee on June 27 and June 28, 1988.

5. Nevertheless, the Debtor's Statement of Financial Affairs and Schedules of Debts and Assets, belatedly filed on July 19, 1988, (over nine months late, see B.Rule 1007(c)), signed by Alexander, state that the total assets of the Debtor had a market value of $36,500.00, including a $5,000.00 deposit to an electrical company; $15,000.00 for the liquor license; and only $16,500.00 for the property in issue, i.e., "Office equipment, furnishing and supplies" of $3,000.00;[1] "Machinery, fixtures, etc.", of $8,500.00; and "Inventory" of $5,000.00. The only explanation of Helen for the huge discrepancy in these valuations of the Debtor's personalty, never corrected by any amendment of the Schedules to this date, was that she rather than her husband was the only one who knew these values and the Schedules had been prepared by her husband only (why was not explained) in such a hurry (despite being filed extremely belatedly) that she did not have time to check them.

6. On July 1, 1988, the date after Alexander's lease expired, Alexander and Helen went to the Premises to begin removing their property, which they hoped to store and utilize in a catering business which would perform on-site services rather than

---

1. Although the B-2 Schedule itself recites only $300.00 for this item, this is obviously a typographical error, as the Summary recites $3,000.00 and the total B-2 Schedule assumes that this figure is $3,000.00.

in-house catering services. They were confronted there by a sheriff and an attorney and other representatives of the Landlord, who refused to let them remove anything but a few personal items, and proceeded to change the locks on the Premises and deny them any further access thereto. The Landlord and its attorney admitted this course of action, justifying same by a purported need to make certain that the property did not vanish. When the court questioned the legality of this conduct near the close of the case, the Landlord's counsel, for the first time, mentioned the court action against Alexander and the subsequent levy, which it apparently contended justified its conduct.

7. Despite the filing of Adv. No. 88–0896S on July 7, 1988, the Landlord, some time in July, 1988, hired Fives to clean out the Premises for a new tenant, Wall-to-Wall Sound, in order that extensive renovations necessary for the new tenant could be expeditiously made. According to Fives, he and the Landlord agreed that, for $10,-000.00, Fives would be allowed to conduct a public sale of any of the property on the Premises for about two weeks. Thereafter, Fives, who dealt in second-hand restaurant equipment, could remove the remainder of the property to his own warehouse. Neither the Debtor, nor its counsel, nor this court were advised of this arrangement. Fives, on his part, was totally unaware that the Debtor was in bankruptcy or of the pending litigation.

8. Fives appeared to be a totally impartial party, although he was called as a witness by the Debtor. He stated that much of the Debtor's property was damaged or destroyed in the renovation process. He produced invoices or receipts for payment of the Debtor's property sold at the Premises, which he advertised by newspaper, for a total of $10,697.00. Fives also stated that, after the sale on the Premises, he had removed an indeterminate amount of the Debtor's property; discarded some; commingled some with his other property in his warehouse; and had no records of what he had taken.

9. Both parties asked Fives, who has 25 years of experience as a dealer in new and used restaurant and catering equipment, what he believed to be the price that he could receive, if given a reasonable time to do so, to liquidate all of the Debtor's personal property situated at the Premises when he first arrived on the Premises. He recited a figure of $100,000 (on questioning by the Debtor) and $50,000 (on cross-examination by the Landlord). When asked the replacement cost of this property, he quoted $700,000.00 (on questioning by the Debtor) and $500,000 (on cross-examination by the landlord).

10. Neither the Debtor, nor its counsel, nor the Landlord's counsel, were aware of the Landlord's transaction with Fives at the time that they negotiated the settlement in Adv. No. 88–0896S on August 12, 1988. Apparently the only negotiations directly between the Debtor's principals and the landlord occurred in July, 1988, when the Landlord offered to let the Debtor remove its property if the Debtor paid it $5,000.00, which offer was refused. The Landlord's attorney admitted that, when the possibility that his client might have disposed of the property was raised in negotiations with the Debtor's attorney in August, 1988, he had stated that such conduct on the part of his client would be foolish and implicitly assured the Debtor's counsel that such was not the case.

11. On or about August 15, 1988, pursuant to the Stipulation, the Debtor's principals and several employees returned to the Premises to attempt to remove the Debtor's personal property. They were shocked and surprised to observe the destruction which had occurred at the Premises, and by the presence of Fives hawking their valuables. Helen testified that she became so upset that day that the Debtor had to arrange to return several days later to attempt to salvage what it could.

12. On or about August 18, 1988, the Debtor and its employees returned, and they removed anything of value they could find there. Upon the Landlord's failure to participate in preparing a joint inventory, per the parties' agreement, Helen made her

own inventory of the property removed, which she claimed was valued at only $9,000.00. Helen testified that the only property belonging to Alexander personally, as opposed to the Debtor, that ever was there were a few personal items, clothing, and pieces of office furniture.

13. The Landlord claims to be still storing certain furniture and kitchen utensils belonging to the Debtor in the basement area of the Premises. No testimony concerning the rent due from either the Debtor or Alexander individually under the respective lease was presented.

## D. CONCLUSIONS OF LAW/DISCUSSION

### 1. THIS COURT HAS JURISDICTION TO HEAR AND DETERMINE THIS MATTER, AS IT IS A CORE PROCEEDING.

█ The instant proceeding is, essentially, an action to recover damages in light of a creditor's alleged violation of the automatic stay imposed by the Debtor's bankruptcy filing, pursuant to 11 U.S.C. § 362(h). Although not among the types of proceedings specifically enumerated in 28 U.S.C. § 157(b)(2), such a proceeding would appear to clearly fall within the residual scope of 28 U.S.C. §§ 157(b)(2)(A) or (b)(2)(G). *See In re TM Carlton House Partners, Inc.*, 93 B.R. 859, 872 (Bankr.E. D.Pa.1988); and *In re Stephen W. Grosse, Inc.*, 84 B.R. 377, 382 n. 4 (Bankr.E.D.Pa. 1988), *aff'd*, 96 B.R. 29 (E.D.Pa.1989). Even if the Debtor's cause of action was based solely upon the Landlord's wrongful, post-petition conversion of property of the estate, apart from any violation of the stay, it would appear that the proceeding would fall within the scope of 28 U.S.C. §§ 157(b)(2)(A) or (b)(2)(O). *See In re Railroad Dynamics, Inc., Altenberg v. Frankford Trust Co.*, 97 B.R. 239, 243 (Bankr.E. D.Pa.1989).

Neither party appears to dispute our power to hear and determine the matter. We shall therefore proceed to do so.

### 2. THE LANDLORD VIOLATED THE AUTOMATIC STAY, PARTICULARLY 11 U.S.C. §§ 362(a)(3) and (a)(6), BY REFUSING TO ALLOW THE DEBTOR TO REMOVE ITS PROPERTY FROM THE PREMISES AT ANY TIME, AS WELL AS BY SELLING AND DISPOSING OF THAT PROPERTY, IRRESPECTIVE OF ITS HAVING OBTAINED RELIEF FROM THE STAY TO REGAIN POSSESSION OF THE PREMISES.

█ The pertinent sections of the Bankruptcy Code allegedly violated by the conduct of the Landlord here are 11 U.S.C. §§ 362(a)(3) and (a)(6), which provide as follows:

§ 362. Automatic stay

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, ... operates as a stay, applicable to all entities, of—

. . . . .

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

. . . . .

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title; ...

It requires no extended discussion or citation of authority to conclude that wrongfully depriving a debtor-in-possession (hereinafter "DIP") of access to virtually all of its personalty, on the ground that the DIP owes a debt to it, is improper action of a creditor to collect a claim and is an improper exercise control over property of a DIP's estate, in violation of both 11 U.S.C. §§ 362(a)(6) and (a)(3), respectively. Here, of course, the Landlord not only prevented the Debtor from exercising control over its personalty, but proceeded to unilaterally hire Fives to sell and/or destroy it.

The Landlord's only real legal defenses appears to be contentions that, because (1) it obtained relief from the automatic stay

in both the Debtor's bankruptcy case and the bankruptcy case of Alexander individually; and (2) it and obtained a pre-petition court judgment and levy in the state-court landlord-tenant action brought against Alexander, it cannot be found to have violated the automatic stay. However, in both of the bankruptcy cases in which relief from the stay was obtained by it, the Landlord was granted relief from the stay merely "to regain possession of the premises." Relief from the stay, for this limited purpose only, clearly did not give the Landlord relief from the stay or authority to detain or take any other action in reference to the personal property of the Debtor's estate on its Premises, even pursuant to lawful state-court processes. Therefore, although it had obtained some limited relief from the automatic stay, any actions by the Landlord which adversely affected the Debtor's right to retain possession of its personalty on the Premises was violative of the residuum of the automatic stay. This being so, the exercise of full dominion over this property by detaining it, destroying it, and liquidating it, constituted a gross violation of the automatic stay by the Landlord.

3. IN ADDITION, THE LANDLORD'S ATTEMPT TO EFFECT A "SELF-HELP EXECUTION" OF THE DEBTOR'S PROPERTY WAS VIOLATIVE OF ANY APPLICABLE STATE LAW.

■ The Landlord's actions as to the Debtor's personalty were also wrongful under several clear principles of pertinent nonbankruptcy law of the Commonwealth of Pennsylvania. First, the mere fact that the Landlord had a right to regain possession of the Premises gave it no right whatsoever to detain, or to then immediately dispose of or liquidate, the Debtor's personalty itself. Even when a tenant has been properly evicted from a premises, a landlord, as the bailee of any and all property left behind by the tenant, must exercise reasonable care in preserving and protecting that property. See In re Murphy Worldwide Transportation Services, Inc., Zimmerman v. Campbell, Bankr. No. 83–04911F, Adv. No. 86–0147F, slip op. at 10–11 (Bankr.E.D.Pa. July 5, 1988); Christensen v. Hoover, 643 P.2d 525, 528–31 (Colo. 1982) (en banc); 339–41 Market St. Corp. v. Darling Stores Corp., 355 Pa. 312, 315–18, 49 A.2d 686, 687–88 (1946); and Watts v. Lehman, 107 Pa. 106, 111–12 (1884). It was unreasonable for the Landlord to refuse to allow the Debtor to remove its personalty from the Premises the very next day after the lease was terminated. As we indicate at pages 815–16 infra, this conduct constituted a conversion. Even from the Landlord's own economic perspective, it was also unreasonable to deny the Debtor, a long-time tenant, any right to remove the property, as the removal would appear to have rendered the Premises more readily available for renovations for a successor-tenant in prompt fashion than hiring someone such as Fives to effect the removal. It was certainly not as if the Debtor had allowed its personalty to remain at the Premises for a lengthy period of time, which might have unreasonably hampered a re-rental of it. It was most unreasonable for the Landlord to then proceed to dispose of the Debtor's property via Fives, less than a month later, without so much as giving the Debtor any notice of its intentions or divulging same to the Debtor's counsel or, apparently, to even its own counsel. Thus, rather than retaining the Debtor's property left behind for any reasonable length of time, as it was obliged to do, the Landlord, immediately after the eviction, first refused to allow the Debtor to recover it and then summarily disposed of the property itself!

The Landlord's attempt to argue that the sheriff's purported levy on the Debtor's personalty enhanced its rights as to the goods is also misplaced, for several reasons. First, it must have been clear to the Landlord, in light of its 23–year relationship with the Debtor, that the personalty on the Premises belonged to the Debtor, not to Alexander personally. The Landlord entered into the lease with Alexander, for the apparent mutual benefit of the parties, with full knowledge that this was a transitory device for the benefit of the Debtor. The Stipulation of June 24, 1988, providing

that Alexander had no interest in the Premises or presumably its contents, confirmed this conclusion. Therefore, any attempt to extend the sheriff's purported levy on the few items of property of *Alexander* at the Premises to all of the *Debtor's* equipment, inventory, and other valuable items in place there clearly constituted a levy known by the Landlord to be wrongful and hence actionable. *See Shane v. Gulf Refining Co.,* 114 Pa.Super. 87, 92–93, 173 A. 738, 740 (1934); *Korrallas v. Griffiths,* 70 Pa. Super. 431, 433 (1918); and 13 STANDARD PA.PRAC.2d 361–63, 364–66, 372–73 (1983).

Secondly, we doubt that the levy effected by the sheriff was proven, on this record, to have been valid. The *only* evidence of the validity of the levy is a copy of the "Sheriff's Levy" form, which only mentions a few specific items before purporting to embrace the "entire contents and all business goods" at the Premises. A return of the levy, which is presumably what the "Sheriff's Levy" form constitutes, must designate the property levied upon to be sufficient. *See Weidensaul v. Reynolds,* 49 Pa. 73, 76–77 (1865); and 12 STANDARD PA.PRAC.2d 480–81 (1983).

Furthermore, a levy is generally only valid if the judicial officer effecting it manually seizes the property levied upon or views the property levied upon and then follows up his view by taking actual possession of the said property within a reasonable time. *See, e.g., Railroad Dynamics, supra,* at 245; *Trainer v. Saunders,* 270 Pa. 451, 453, 113 A. 681, 682 (1921); *Dixon v. White Sewing Machine Co.,* 128 Pa. 397, 405, 18 A. 502, 503 (1889); and 12 STANDARD PA.PRAC.2d, *supra,* at 454–55. Here, clearly the sheriff did not take the Debtor's property into his possession. Although he may have seen more of it than he specified, there is insufficient evidence of what he saw to meet the Landlord's burden of establishing that the levy extended to any of the property other than that specifically designated on the "Sheriff's Levy" form. *See Railroad Dynamics, supra,* at 245–46. Furthermore, the sheriff apparently never took the property into his possession at any time. Rather, the Land-lord took it upon itself to take possession of and dispose of the property.

This last point is very significant in the state-law analysis. It must be recalled that, when a judicial officer levies upon personalty, the property is placed in the custody of that officer or the court that issued the writ of execution. 12 STANDARD PA.PRAC.2d, *supra,* at 457. The subsequent execution sale is then scheduled, noticed, and conducted *by the judicial officer. Id.* at 465–66. Even a valid execution levy on behalf of a judgment creditor does *not* give the judgment creditor ownership of the property, or a right to sell the property itself. *Mortgage Bldg. & Loan Ass'n v. J.B. VanSciver & Co.,* 304 Pa. 408, 420–21, 155 A. 920, 924–25 (1931); and 12 STANDARD PA.PRAC.2d, *supra,* at 465. Thus, the Landlord's officious disposition of the Debtor's property through Fives, without the medium of a sheriff's sale or the sheriff's participation in the disposition process at all, is totally inconsistent with any contention that the sheriff performed a valid levy of the Debtor's property. If the levy was valid, then the Landlord's action of allowing Fives to remove and sell it was clearly illegal.

What we are left with is the unmistakable conclusion that, pursuant to principles of applicable nonbankruptcy law, the Landlord, by failing to comply with the proper procedural devices in attempting to effect what might be termed an illegal, self-help execution upon the Debtor's property, in fact converted the property. An attempt by a creditor to dispose of property of his debtor pursuant to purported rights of a lienholder which have no basis in law constitutes a conversion of the debtor's property. *See Parks v. "Mr. Ford,"* 386 F.Supp. 1251, 1255 (E.D.Pa.1975), *aff'd in part and rev'd in part on other grounds,* 556 F.2d 132 (3d Cir.1977) (en banc); *Brisben v. Wilson,* 60 Pa. 452, 457–58 (1869); and *Bernstein v. Hineman,* 86 Pa.Super. 198, 201 (1926). The Debtor's interest in the property was clearly not rightfully cut off by the Landlord's wrongful purported sale of the property to Fives, or Fives' subsequent sale of it. *See In re Windsor Communications Group, Inc.,* 80 B.R. 712, 723–27

(Bankr.E.D.Pa.1987), *aff'd in [pertinent] part and vacated in part sub nom. Windsor Communications Group, Inc. v. Metropolitan Consolidated Industries, Inc.,* 96 B.R. 495 (E.D.Pa.1989); and *In re Bavitz,* 27 B.R. 189, 190–91 (Bankr.M.D.Pa. 1982). Therefore, the Debtor is entitled to damages based on the value of the property destroyed, damaged, and/or sold and removed from the Premises by the Landlord and/or Fives. The Landlord is liable for Fives' action, as Fives was clearly acting as the agent of the Landlord in effecting removal of the Debtor's property, *see Christensen, supra,* 643 P.2d at 531, and most of the Debtor's personal property was completely destroyed, dismembered, or lost forever to it by this course of action. *See Windsor, supra,* 80 B.R. at 727–28.

Therefore, even without the presence of the bankruptcy law issue concerning the violation of the automatic stay pursuant to which it can be held to account to the Debtor, the Landlord would be liable to the Debtor for the loss of its property under applicable nonbankruptcy law principles.

4. THE MEASURE OF THE ACTUAL DAMAGES TO WHICH THE DEBTOR IS ENTITLED TO RECOVER AS A RESULT OF THE LANDLORD'S VIOLATION OF ITS RIGHTS IS LIMITED TO THE LOWEST ESTIMATE RECITED AT TRIAL, LARGELY DUE TO THE DEBTOR'S VERY LOW EVALUATION OF THE PROPERTY ON ITS UNAMENDED BANKRUPTCY SCHEDULES, i.e., $50,000.00.

There is little doubt that the actions of the Landlord in issue here were "willful," within the meaning of § 362(h) of that Code Section has been interpreted by this court. *See In re McLaughlin, McLaughlin v. Fireman's Trust Mortgage Corp.,* 96 B.R. 554, 559–60, 562–63 (Bankr.E.D.Pa. 1989) (collecting cases holding that knowledge of the bankruptcy filing is the legal equivalent of knowledge of the automatic stay). The Landlord clearly knew about the Debtor's bankruptcy. Further, certain of its agents were completely aware of the automatic stay and its impact, having litigated two motions seeking relief from same, one in this case and one in Alexander's related case. *Compare, id.,* at 559–61, 562–63 (even where creditor acts in "good faith," it may be liable for damages under § 362(h)). As we indicate at pages 817–19 *infra,* the Landlord's conduct here is aggravated, and merits considerable punitive damages as well as compensatory "actual damages" to the Debtor.

However, a difficult issue is presented in determining the value of the Debtor's property destroyed by the Landlord and hence constituting the appropriate measure of compensatory damages to the Debtor here. We have three points of reference: (1) The Debtor's own Schedules, which would limit its recovery to $16,500; (2) Helen's testimony, which would support a recovery of $400,000; and (3) Fives' testimony in which he stated that he would have expected to have realized a recovery of between $50,000 and $100,000 for the property in issue "as is," and that its replacement cost ranged from between $500,000 and $700,000.

Acceptance of Helen's testimony is problematical for several reasons. Although she is clearly competent to testify as to the value of her own corporation's property, *see In re Corbett,* 80 B.R. 32, 36 (Bankr.E.D.Pa.1987); and *In re Blakey,* 76 B.R. 465, 469, *modified,* 78 B.R. 435 (Bankr.E.D.Pa. 1987), her proof of the value consists of lists, itemized by entry but not by the value of each entry, which are based on her memory of *acquisition* costs of that property over the past 30 years. Moreover, she is obviously a biased witness. In our view, it is the market value of the goods as of July, 1988, which must control the evaluative process. This is the measure of damages for property converted. *See, e.g., Knuth v. Erie–Crawford Dairy Cooperative Ass'n,* 463 F.2d 470, 478–79 (3d Cir.1972), *cert. denied,* 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed. 2d 278 (1973). Replacement or acquisition costs are relevant, but they are certainly not the ultimate barometer of the actual damages suffered by the Debtor from the loss of its property. The difficulty of effecting a replacement is merely a factor in

ascertaining consequential damages and in measuring the appropriate punitive damages. However, no evidence of any consequential damages was proven. Therefore, we believe that the sole measure of the Debtor's actual damages must be the market value of the Debtor's goods at the time of their conversion by the Landlord.

The weight of Helen's apparently accurate testimony regarding acquisition costs is lessened by their comparison to the figures on the Schedules. We cannot emphasize strongly enough that it is important that debtors complete their Schedules accurately. *See In re Woodson,* 839 F.2d 610, 614–17 (9th Cir.1988). They are, of course, prepared on a self-declaratory "honor system." *See id.* at 616; and *Payne v. Wood,* 775 F.2d 202, 204–07 (7th Cir.1985), *cert. denied,* 475 U.S. 1085, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986). They must therefore be considered highly significant, at least when invoked against a debtor to attempt to hold it to its own "honor-system" declarations. The weakest part of Helen's testimony was her futile efforts to explain why the Schedules were filled out incorrectly. We see no reason why Alexander would be totally ignorant about the value of the Debtor's property nor why, if he were uncertain, he would not have consulted with his wife about the figures. It is, moreover, inexcusable that no amendment has been made, even to date, and we are therefore including, in our Order, a directive that this be done. It ill befits a debtor to admit that its own Schedules are not only inaccurate, but remain unamended to correct the inaccuracies after they are pointed out to it.

However, in the context of this case, we decline to bind the Debtor to the declarations in its Schedules. We firmly believe that they *were* inaccurate. They shall be considered as a significant factor, causing us to utilize the low range of the other estimates of the property's value in our calculation of damages. However, we do not hold them to be conclusive and therefore do not estop the Debtor from claiming more than $16,500 for the loss of its property.

We believe that the apparently totally disinterested testimony of Fives is the best measure of the value of the property on this record. Fives was unbiased and obviously had some expertise in this area. We discount his replacement figures because, again, we do not consider the cost of replacement to be the proper measure of the damages of the Debtor. That leaves us with Fives' estimate of the market value of the property in the rather wide $50,000 to $100,000 range. The Debtor did recover about $9,000 worth of property on or about August 18, 1988; has recovered or apparently will recover $10,697 from the proceeds realized by Fives; and, according to the Landlord, it is holding other property of the Debtor. Taking these factors into account and in light of an inclusion, in our Order, of a directive to the Landlord to turn over all of the Debtor's property retained by it, we shall set the figure at the low end of Fives' estimate. We therefore conclude that the value of the Debtor's property lost, and hence its actual damages, are $50,000.[2] *Compare Windsor, supra,* 80 B.R. at 727–28 (value of loss of converted property measured at figure established by the most objective measure available, *i.e.,* the parties' prelitigation contract).

5. THE OPPRESSIVE AND ILLEGAL CONDUCT ENGAGED IN BY THE LARGE AND FINANCIALLY–LIQUID LANDLORD JUSTIFY AN IMPOSITION OF PUNITIVE DAMAGES OF $10,000 AND LOSS OF THE LANDLORD'S OWN CLAIM AGAINST THE DEBTOR.

We further agree with the Debtor, on the subject of damages, that this case presents

2. In accepting Fives' estimates, we assume that his understanding of what he could sell would be the equivalent of what the Debtor should have been allowed to remove, under the Stipulation of August 12, 1987, exclusive of fixtures. It is therefore not necessary for us to decide whether "trade fixtures" were meant to be included among the fixtures which the Debtor agreed, in that Stipulation, to allow the Landlord to dispose of, as it saw fit. *See In re Lipschutz,* 228 F.2d 290, 291 (3d Cir.1955); and *Cattie v. Joseph P. Cattie & Bros., Inc.,* 403 Pa. 161, 163–64, 168 A.2d 313, 314–15 (1961).

"appropriate circumstances" for imposition of punitive damages under § 362(h). Punitive damages are appropriate when the motives of the wrongdoer evince the sort of oppressive and aggravated conduct which the court, by placing an additional imposition on the pocketbook of the wrongdoer and by taking into account the wrongdoer's financial status, must impose as appropriate to deter the wrongdoer or others like it from engaging in such conduct in the future. *See In re Aponte,* 82 B.R. 738, 745–46 (Bankr.E.D.Pa.1988); *In re Tigue,* 82 B.R. 724, 737–78 n. 3 (Bankr.E.D.Pa.1988); and *In re Wagner,* 74 B.R. 898, 905 (Bankr. E.D.Pa.1987).

We find that the actions of the Landlord here were indeed oppressive and, as we expressed at the close of the trial, when our emotional reactions to the facts of the case were most vivid, were simply outrageous. The stay violation was totally willful. Even had there been no stay violation, the Landlord's conduct would have been unlawful, for the reasons stated at pages 815–816 *supra.* The Landlord's actions, as the Debtor's counsel expressed at trial, constituted a literal introduction of several bulls (*i.e.,* Fives and the renovators at the premises) into a china shop. The destruction of the property of a long-time tenant by the Landlord to serve its own short-range financial ends was reprehensible. Moreover, the Landlord might have served even its own ends better by allowing the Debtor to remove its own property. In sum, the Landlord's behavior was characterized by a mode of destruction and disrespect for the law, the needs and interests of the Debtor, and its own interests which we find intolerable.

The conduct in issue here was not comparable to the conduct in issue in *Aponte* and *Wagner* in that it was not physically threatening to the Debtor's officers. How-

ever, the body of an inanimate corporation is its assets. The Landlord committed a figurative homicide of the Debtor in its course of actions, and greatly decreased the potential alternatives which it now has available to it in its efforts to reorganize.

We shall therefore award the Debtor two types of punitive damages. First, we will award it monetary damages of $10,000. Given that this wrongdoer is a large realty trust which apparently owns several shopping centers, *compare Aponte, supra;* and *Wagner, supra* (wrongdoers were individuals of moderate means), this is scarcely a liberal award. Secondly, we shall order that the Landlord allow the Debtor to recover all of the Debtor's property remaining in its possession on or before June 2, 1989. Finally, we shall dismiss the Landlord's counterclaim and order that the Landlord cannot share in the distribution of the assets of the Debtor's estate.

Insofar as the last of these elements of damages is concerned, we note that the Landlord has not even filed a claim in the Debtor's case.[3] However, no bar date has been established and, but for our directive, such a claim could still be filed. We recognize that the Landlord claims to be owed rents in excess of $270,000. However, it is unclear how this sum was measured, and we note that, even with the Landlord's claim excised and this award annexed, the Debtor's liabilities appear to exceed its assets. It is therefore unclear what recovery the Landlord could have expected to have actually received in any distribution of the assets of the Debtor's estate. In any event, given our distaste for the Landlord's actions, we deem it necessary to assure that no portion of the award against it will eventually return to its pocket.

Finally, we shall allow the Debtor to recover attorneys' fees for its counsel pur-

---

**3.** The Landlord's attempt to assert a proof of claim in its counterclaim is, in any event, doomed. If the Landlord desired to assert a proof of claim, it would have been obliged to invoke the claims process, not attempt to litigate the claim as a counterclaim in this proceeding. *See, e.g., In re Clark,* 91 B.R. 324, 337–39, 342 (Bankr.E.D.Pa.1988); and *In re International Endoscope Manufacturers, Inc.,* 79 B.R. 620

(Bankr.E.D.Pa.1987). Furthermore, we do not believe that the Landlord could set off post-petition (or pre-petition) rent claims against the damages awarded here, due to the absence of mutuality in these obligations. *See* 11 U.S.C. § 553(a); *In re Windsor Communications Group, Inc.,* 79 B.R. 210, 215–16 (E.D.Pa.1987); and *Carlton House, supra,* 93 B.R. at 867.

suant to 11 U.S.C. § 362(h). *See McLaughlin, supra.*

## E. CONCLUSION

For the reasons stated herein, we enter the attached Order.

### ORDER

AND NOW, this 24th day of March, 1989, after a trial of the above proceeding on January 10, 1989, and upon review of the transcript of the trial and the post-trial-submissions of the parties, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Plaintiff–Debtor B. COHEN & SONS CATERERS, INC., and against the Defendant, NEW PLAN REALTY TRUST (hereinafter referred to as "New Plan"), on the claim, and the Plaintiff is awarded monetary damages in the amount of $60,000 ($50,000 compensatory damages and $10,000 punitive damages).

2. Judgment is also entered in favor of the Plaintiff and against New Plan on New Plan's counterclaim. As part of the ruling in favor of the Plaintiff on its claim, New Plan is hereby BARRED from filing or making any proof of claim against the Plaintiff.

3. As part of the further ruling on the Plaintiff's claim, New Plan is ORDERED to preserve and protect any property of the Plaintiff in its possession and allow the Plaintiff to recover that property, without any charge to the Plaintiff, at any time before June 2, 1989.

4. The Plaintiff is directed to amend Schedule B–2 of its Schedules, and serve all interested parties with same, on or before March 31, 1989.

5. The Plaintiff is also awarded reasonable attorneys' fees and costs pursuant to 11 U.S.C. § 362(h). The parties are directed to confer to resolve the issue of attorneys' fees and costs due to the Plaintiff's counsel but, if they are unable to resolve this issue, and the Plaintiff has made a reasonable demand, the Plaintiff may file a motion requesting reasonable attorneys' fees and costs, including compensation on the fee application, if such is necessary, same to be filed within thirty (30) days of the date of this Order, in procedural conformity with *In re Meade Land and Development Co., Inc.,* 527 F.2d 280 (3d Cir. 1975); and *In re Mayflower Associates,* 78 B.R. 41 (Bankr.E.D.Pa.1987).

6. The Debtor is directed to amend its Plan and Disclosure Statement and to include, in the latter, a full explanation of (a) the Plan, (b) the present financial status of the Debtor, (c) the outcome of this proceeding, (d) detail as to the total assets and liabilities of the Debtor, and (e) detail as to anticipated payments to creditors, and notify all interested parties of same on or before April 28, 1989.

7. A hearing on the Amended Disclosure Statement shall be scheduled on

WEDNESDAY, MAY 31, 1989, at 10:00 A.M. and shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

8. If the Debtor fails to comply with paragraphs 7 and 8 above, this case may be dismissed or converted to Chapter 7 by the Court without further notice or hearing.