In re ORSA ASSOCIATES, Debtor.

In re George C. DORAN, Sr. and Gloria J. Doran, Debtors.

ORSA ASSOCIATES, INC. and George C. Doran, Sr., and Gloria J. Doran, Plaintiffs,

v.

MBA FINANCIAL, INC.

Bankruptcy Nos. 88–14395S, 88–14396S. Adv. Nos. 89–0004S, 89–0005S.

United States Bankruptcy Court, E.D. Pennsylvania.

April 25, 1989.

As Amended April 26, 1989.

John Francis Murphy, Doylestown, Pa., for debtors.

James J. O'Connell, Philadelphia, Pa., Ass't. U.S. trustee.

Michael N. Gatto, Norristown, Pa., for defendant.

Edward Sparkman, Philadelphia, Pa., standing Chapter 13 trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The parties in the instant two adversary proceedings initiated in two separate related bankruptcy cases raise a multitude of issues for our consideration. We decline to totally resolve many of them. We focus herein mainly upon the efforts of the related Debtors to undo the Defendant-factor's extrajudicial "self-help execution" upon four pieces of real estate, given by the Debtors as security for a related entity's factoring agreement, upon the alleged default of the factoring agreement by the related entity. We hold that the transfers can be avoided on the basis of 11 U.S.C. § 548(a)(2). The only other issue that we actually need to and therefore do decide at this juncture is that the Debtors' claims for violations of the automatic stay and attorneys' fees must be dismissed. All issues relating to the legitimacy of the Defendant's underlying claims against the Debtors and the extent of the resultant lien that the Defendant may have against the Debtors under 11 U.S.C. § 548(c) are deferred to the later claims process. Our only other directive in our resulting Order is that the Debtors file their Schedules and Plans within time-frames which we have established in order that these cases must be promptly administered.

### B. PROCEDURAL HISTORY

GEORGE C. DORAN, SR. (hereinafter referred to as "Doran") and GLORIA J. DORAN (hereinafter "the Dorans") filed a joint Chapter 13 bankruptcy case on December 16, 1988. Simultaneously, Doran also filed a Chapter 11 proceeding on behalf of ORSA ASSOCIATES, INC. (hereinafter "Orsa") (collectively the Dorans and Orsa are referred to herein as "the Debtors"), a corporation of which he is President and Chief Operating Officer which formerly owned and operated several parcels of residential realty. Except for the filing of a motion for relief from the automatic stay under 11 U.S.C. § 362(d) on February 10, 1989, by the Defendant in both

adversary proceedings before us, MBA FINANCIAL, INC. (referred to herein as "the Defendant"), the Dorans' bankruptcy case has been virtually dormant, due to the Dorans' failure to file their Chapter 13 Statement, Plan, or other necessary documents. Orsa's similar failure to file Statements or Schedules has apparently motivated two outstanding motions by the United States Trustee to appoint a trustee or convert the case to Chapter 7, listed for hearings on April 26, 1989, and May 3, 1989, respectively.

The two instant adversary proceedings were filed simultaneously on January 4, 1989. They were tried together most of the day on February 22, 1989, and a few additional hours on February 27, 1989. Since we were cognizant that their disposition must precede the resolution of the Defendant's § 362(d) motion, which need be resolved quickly, see 11 U.S.C. § 362(e), we entered an Order of February 28, 1989, obliging the parties to promptly prepare proposed findings of fact, proposed conclusions of law, and briefs without the benefit of a transcribed record, on or before March 20, 1989 (Debtors), and April 3, 1989 (Defendant). Although the Debtors' filings were early (March 16, 1989), the Defendant requested and obtained, without objection, an extension until April 10, 1989, to file its submissions. The latter filing was timely, although the Defendant delayed our processes by failing to heed the directive in our Order that copies of same be submitted directly to our chambers.

The Briefs of both parties are broken down into Discussions of twelve separate issues. We ultimately determined that our resolution of only the fifth (11 U.S.C. § 548) and last two (contempt and attorneys' fees) issues were necessary to effect our decision at this time. We therefore shall confine most of our findings of fact and conclusions of law and subsequent discussions thereof, which we are obliged to submit in deciding these matters pursuant

to Bankruptcy Rule (hereinafter "B.Rule") 7052 and Federal Rule of Civil Procedure (hereinafter "F.R.Civ.P.") 52(a), to those issues.

## C. FINDINGS OF FACT

1. In July, 1988, Doran contacted the Defendant, situated in Rockville, Maryland, by telephone in response to a magazine advertisement concerning the Defendant's potential availability to factor[1] the accounts receivable of a business known as Pennsylvania Yellow Pages by Korman, Inc. (hereinafter referred to as "PYP"), which Doran was in the process of purchasing for a total consideration of $250,000.

2. The Defendant expressed interest in the transaction only after Doran offered to secure such an arrangement with his jointly-owned home and the real estate holdings of his Corporation, Orsa.

3. On August 3, 1988, Doran, on behalf of PYP, and Marilyn Tayler (hereinafter "Marilyn"), the Vice–President of the Defendant, executed a "Factoring Agreement and Security Agreement" (hereinafter the "Factoring Agreement"), prepared on forms utilized by the Defendant, for the factoring of PYP's accounts receivable to the Defendant.

4. In connection with the execution of the Factoring Agreement, the Dorans (but not Orsa) personally guaranteed the debt of PYP arising therefrom and executed a deed conveying their home at 36 Indian Creek Entry, Levittown, Pennsylvania (hereinafter "the Home") to the Defendant. Orsa, per Doran, executed deeds conveying the only properties owned by it, located at 850 Parker Street (hereinafter "Parker St.") and 1110 Kerlin Street (hereinafter "Kerlin St."), Chester, PA; and 2100 E. York Street, Philadelphia, PA (hereinafter "York St."), to the Defendant. Also, Doran signed a trustee escrow agreement ("the Escrow") placing the deeds in the custody of Marc Jonas, Esquire (herein-

---

1. A factoring arrangement contemplates a business's assignment of accounts receivable to a third party who advances a percentage of the face value of the accounts to the business and then collects the accounts itself. *See, e.g., In re Freeman,* 294 F.2d 126, 129 (3d Cir.1961); *Sterling Nat'l Bank & Trust Co. v. Federated Dep't Stores, Inc.,* 612 F.Supp. 144, 145 (S.D.N.Y. 1985); and BLACK'S LAW DICTIONARY 532 (5th ed. 1979) (definition of "Factoring").

after "Jonas"), a local attorney chosen by the Defendant as escrow agent.

5. The Factoring Agreement provided, essentially, that the Defendant would pay to PYP sixty (60%) percent of all bona fide accounts receivables of PYP which were factored and accepted by the Defendant, less a discount and expenses, under certain conditions set forth therein, which included PYP's scheduling the accounts on certain designated forms and providing back-up original documentation therefor.

6. The deeds failed to include any certifications of the address of the grantee, as required by state law, 16 P.S. § 9781, and the acknowledgements are not in the precise format required by other state law, 21 P.S. §§ 291.5, 291.7.

7. On or about August 5, 1988, PYP assigned accounts receivable to the Defendant pursuant to the Factoring Agreement, which Doran contended and believed were worth about $300,000, but did not include all of the supporting documentation on these accounts which the Defendant required.

8. Doran anticipated receiving funds from the Defendant immediately to close his purchase of PYP. Therefore, he urged the Defendant to advance him $180,000 immediately, while claiming to be in the process of getting his papers together to supply the necessary documentation.

9. On August 10, 1988, the Defendant wired to PYP a check in the amount of $96,647.58. Although this was not as much as Doran requested, it was sufficient to allow him to complete the settlement to purchase PYP on that day.

10. Between August 10, 1988, and August 17, 1988, when they were finally produced, the Defendant made repeated demands upon Doran and PYP to provide the original documentation of its accounts assigned to it, as required under the Factoring Agreement.

11. On August 18, 1988, upon reviewing same, the Defendant immediately ascertained that the documentation submitted was, in most cases, insufficient. Therefore, at the Defendant's request, the par-

ties met, on August 26, 1988, in Rockville, to attempt to set the transaction on course. Doran, believing that the Defendant had not paid him all of the funds that he counted upon receiving in the transaction, requested a payoff-figure in order that he could terminate the relationship and seek another factor. He was quoted a figure of $130,168.65 in response, which allegedly represented the original $96,647.58, plus certain costs and expenses of the Defendant pursuant to the Factoring Agreement.

12. On September 6, 1988, the Defendant sent a stern and legalistic letter to the Dorans and PYP in which it demanded payment of $220,000 by September 12, 1988, which it claimed was the amount due to it at that time under the Factoring Agreement.

13. When this sum was not forthcoming, the Defendant, on the following day, requested an attorney employed by them in the past, but not engaged in this matter, Stephen Beinstock, Esquire (hereinafter "Beinstock"), to complete an Affidavit of Default, which stated that the sum of $221,610.65 was due to the Defendant from PYP. In the capacity of an "officer of the court," Beinstock, at the Defendant's request, forwarded same to Jonas.

14. Immediately upon receipt of the Affidavit, on September 14 or 15, 1988, Jonas released the deeds to the four properties which he was holding under the Escrow to the Defendant.

15. On September 15, 1988, the Defendant recorded the deed relating to the Home in Bucks County, PA. That same day, the Defendant "docketed" the two subject deeds to the Parker and Kerlin properties in Delaware County, PA. Neither these deeds, nor the York deed, have been finally recorded to date.

16. Nevertheless, the rents from the tenants of Parker and Kerlin (York being unoccupied) have apparently been held in escrow by the Defendant since this filing, rather than being paid Orsa, as they had been previously.

17. On October 13, 1988, the Defendant, per Beinstock, entered a confessed judg-

ment in the amount of $164,622.64, including attorneys' fees of $32,908.53, in the Montgomery County, MD state courts against the Dorans.

18. On December 9, 1988, Doran and Wayne Simone (hereinafter "Simone"), whom the Debtor had contacted to assist him in printing and publishing the directory envisioned by PYP, met with officers of the Defendant to attempt to resolve their differences. However, when the Defendant insisted that he transfer his interest in PYP to Simone without consideration as a condition of a settlement, Doran balked and no agreement was reached.

19. In late December, 1988, PYP's landlord entered and executed a judgment for possession against PYP and apparently seized all of its records and materials. The Defendant and Simone thereafter obtained possession of these records and materials from the landlord and are themselves attempting to publish the PYP directory envisioned by Doran.

20. The Defendant had only collected about $8,800 on the accounts receivable transferred to it by Doran pursuant to the Factoring Agreement as of the time of trial. The Defendant attributed this to the poor quality of the referrals to it from PYP, but it also is apparent that this is because the extreme delays which have occurred in the publishing of the planned directory have made subscribers skeptical of its completion and consequently reluctant to pay.

21. The Defendant anticipates realizing much more on the accounts receivable subsequent to its planned publication of the PYP directory.

22. Baron Tayler (hereinafter "Baron"), Marilyn's son and a principal of the Defendant, testified that the Defendant's intention was to return all of the real estate obtained by it through the deeds to the Dorans and Orsa as soon as the Defendant realized the amount of its alleged indebtedness of $164,622.64, plus subsequent accruing costs. However, we note that, in its § 362(d) motion, the Defendant sought relief to evict the Dorans from the Home immediately.

23. Doran testified that the fair market value of the Home, as of September 15, 1988, was $120,000 to $130,000; and that the fair market value of Orsa's properties were as follows:

Parker—$400,000 to $500,000; Kerlin—$35,000 to $45,000; and York (in process of rehabilitation)—$15,000. Marilyn disputed the Parker figure, stating that she believed that it was worth only about $175,000. Neither party produced any expert appraisals of any of the properties.

24. Doran, in testimony also unsupported by any documentation, claimed that the Home was subject to only a mortgage of $45,000; Parker, a mortgage of $196,000 to $226,000, plus a blanket mortgage also covering Kerlin on which he claimed the balance was only $40,000; Kerlin, the above-mentioned blanket mortgage and another mortgage of $20,000 to $25,000; and York, a mortgage of $50,000. The Defendant claims that the blanket mortgage also covers the Home.

25. Given the poor quality. of evidence on this issue, we conclude that the fair market value of Orsa's properties approximately equalled the mortgages as of September 15, 1988, and, therefore, Orsa had no equity in any of its properties. However, we conclude that an equity of at least $75,000 existed in the Home as of September 15, 1988.

26. The value of PYP is also disputed. Doran claims it may be worth $1.5 million. The purchase price, in August, 1988, was $250,000. However, the Defendant contends, probably correctly, that it has had virtually no value to Doran or anyone else unless the directory were published which Doran was and will be unable to accomplish.

27. The only other property owned by the Dorans in the period from August 1, 1988, to date which might be non-exempt is Doran's interest in a dormant business known as the Sink & Countertop Shop Co. Doran had previously estimated the value of this business as $135,000 due to its having an unliquidated insurance claim in that amount. This business appears to us

to have had little or no real value during the pertinent period from August 1, 1988, to date.

28. The only property owned by Orsa other than the three properties which it deeded to the Defendant is an option to purchase two properties in Chester worth about $60,000, which it has been and will be unable to exercise and is therefore worthless.

29. The Dorans are both gainfully employed in regular jobs. Doran has an income of about $36,000 annually and his wife has an income of about $10,000 annually.

30. Doran impressed us as careless and over his head in attempting to purchase PYP. The Dorans were extremely unwise in not retaining any counsel over the course of this entire matter until belatedly engaging present counsel on or about December 15, 1988.

31. On December 15, 1988, the Dorans' counsel wrote to the Defendant's present counsel, Beinstock, and Baron, and requested that the Defendant return the realty to the Debtors on the following day in light of their bankruptcy filing. Further, he stated that, if the Defendant failed to do so, it would, in his opinion, be proceeding in violation of § 362(a) of the Bankruptcy Code and would be liable for damages, attorneys' fees and costs to the Debtors. The Defendant refused to accede to this demand, and the instant proceedings were commenced.

## D. CONCLUSIONS OF LAW

1. *These Matters are core proceedings which we can both hear and determine*

The parties agree that the instant proceedings are both "core" in nature. We also agree. The main proceeding, Adversary No. 89–0005S, attacks the transfers of the Debtors' realty to the Defendant on the grounds that they are preferential transfers, implicating 28 U.S.C. § 157(b)(2)(F), or fraudulent conveyances, pursuant to 28 U.S.C. § 157(b)(2)(H). A turnover of the properties is sought, giving rise to a claim under 28 U.S.C. § 157(b)(2)(E). This pro-

ceeding also involves issues highly relevant to the liquidation of what are most of the assets of the Debtors' estates, thereby arguably also justifying invocation of 28 U.S.C. § 157(b)(2)(O).

The secondary proceeding, Adversary No. 89–0004S, is also core in nature. As we recently reaffirmed in *In re B. Cohen & Sons Caterers, Inc., B. Cohen & Sons Caterers, Inc. v. New Plan Realty Trust,* 97 B.R. 808, 813 (Bankr.E.D.Pa.1989), proceedings seeking to recover damages for an alleged violation of the automatic stay, as in the principal thrust of this action, have consistently been classified as a core proceedings under 28 U.S.C. §§ 157(b)(2)(A) or 157(b)(2)(G) in this court. *See, e.g., In re TM Carlton House Partners, Ltd.,* 93 B.R. 859, 872 (Bankr.E.D.Pa.1988); and *In re Stephen W. Grosse, P.C.,* 84 B.R. 377, 382 n. 4 (Bankr.E.D.Pa.1988), *aff'd,* 96 B.R. 29 (E.D.Pa.1989).

We shall therefore proceed to enter final orders in both of these matters.

2. *An overview of the Debtors' Claims*

In their Brief, the Debtors proffer various theories upon which they claim that they are entitled to recover the realty which the Defendant has attempted to seize upon PYP's alleged default of its obligations under the Factoring Agreement. By reference to the "Discussion" subtitles in the Debtors' Brief, these include the following, some of which, as noted, were not articulated in the Debtors' Complaint:

1. Discussions I, II, and IV—The deeds do not bear the addresses of the grantees and do not contain the proper acknowledgements, in violation of 16 P.S. § 9781; and 21 P.S. §§ 42, 291.5, and 291.7, respectively. Therefore, pursuant to 11 U.S.C. § 544(a), the Debtors are empowered to invalidate the deeds. Closely related is another argument that, pursuant to § 544(a)(3), the Debtors are entitled to declare these documents void.

2. Discussion III—The Defendant seized the property of the Debtors without any prior court determination of its right to do so, in violation of the due process rights

of the Debtors. This theory is not pleaded in the Complaint.

3. Discussions V, VI, and VII—The transfers effected on August 3, 1988, and/or the attempts to record the deeds by the Defendant on September 14, 1988, are fraudulent conveyances avoidable under 11 U.S.C. § 548(a)(2). Moreover, the Defendant did not take "for value and in good faith" in these transfers, thus destroying its right to a lien for even the sums actually advanced, *i.e.*, $96,647.58 plus out-of-pocket costs. Closely related is a cause of action asserted under the Pennsylvania Uniform Fraudulent Conveyances Act, 39 P.S. § 354. Only the claim under § 548(a)(2) is recited in the Complaint.

4. Discussion VIII—The attempted recordations of the deeds constitute preferential transfers under 11 U.S.C. § 547. Since the crucial events occurred just outside the 90–day period of 11 U.S.C. § 547(b)(4)(A), the Debtors are compelled to invoke 11 U.S.C. § 547(b)(4)(B) and argue that the Defendant is an "affiliate-insider" of the Debtors, pursuant to 11 U.S.C. §§ 101(30)(E) and 101(2)(D).

5. Discussions IX and X—The advances to PYP by the Defendant were so far outside of the scope of the terms of the Factoring Agreement that the loans and the guarantees are invalid. These issues were also not pleaded in the Complaint.

6. Discussions XI and XII—The Defendant is liable for damages for violation of 11 U.S.C. § 362(a)(3) by reason of its continuing to exercise control over the property of the Debtors after their counsel's demand for their return, thus entitling the Debtors to redress for contempt or pursuant to 11 U.S.C. § 362(h). Attorneys' fees are also claimed to be due to the Debtors' counsel because of the Defendant's purported "bad faith" in asserting its defenses.

We conclude that the Debtors' claims under 11 U.S.C. § 548(a)(2), being properly pleaded and proven, are both an appropriate and a sufficient basis on which to grant the Debtors all of the relief which we are prepared to grant to them at this point. We discuss the due process claim, which we believe is meritorious; but, since it is not pleaded, we are reluctant to rely upon. We also briefly explain our reservations about the § 544(a) and § 547 arguments. We indicate our belief that the issue of the merits of the Defendant's claims, and hence the scope of its lien under § 548(c), must be deferred to the subsequent claims process, because the rights of the parties must be re-settled in light of this decision and the bankruptcy cases are at such an early stage. Finally, we reject the requests that we find a violation of the automatic stay, as pleaded and proven, and we do not perceive any basis on which to allow a recovery of attorneys' fees to the Debtors.

3. *The Defendant's attempted executions upon the properties of the Debtors constitute transfers which the Debtors are entitled to avoid pursuant to 11 U.S.C. §§ 548(a)(2)(A) and (a)(2)(B)(i) or (b)(2)(B)(ii)*

The most clearly meritorious of the Debtors' claims is that based upon 11 U.S.C. § 548(a)(2). That section and 11 U.S.C. § 548(c), which we consider subsequently herein, read as follows:

§ 548. Fraudulent transfers and obligations

(a) the trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred in or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . . . .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any

property remaining with the debtor was an unreasonably small capitol; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

. . . . .

(c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

This Code section has been successfully invoked in this jurisdiction to attack a wide range of transfers of property of debtors in which the debtors failed to receive adequate consideration, most notably regularly-conducted, non-collusive sheriff's sales in which inadequate bids for property sold were received, *see In re Cole,* 81 B.R. 326 (Bankr.E.D.Pa.1988); and *In re Corbett,* 80 B.R. 32 (Bankr.E.D.Pa.1987), and terminations of leases and other valuable property interests. *See In re Pinto,* 98 B.R. 200 (Bankr.E.D.Pa.1989), *modifying,* 89 B.R. 486 (Bankr.E.D.Pa.1988).

It is clear that Orsa, as a Debtor-in-Possession, may utilize the powers of the trustee to invoke § 548. *See* 11 U.S.C. § 1107(a). It is equally clear that the Dorans may "stand in the shoes" of the Standing Chapter 13 Trustee and assert his powers pursuant to 11 U.S.C. §§ 522(g)(1), (h). *See In re Aikens,* 94 B.R. 869, 872–73 (Bankr.E.D.Pa.1989); *Cole, supra,* 81 B.R. at 321; *Corbett, supra,* 80 B.R. at 35; and *In re Butler,* 75 B.R. 528, 530 (Bankr.E.D. Pa.1987), *rev'd on other grounds sub nom. Butler v. Lomas & Nettleton Co.,* 862 F.2d 1015 (3d Cir.1988).

It is not totally clear, however, precisely which transfer the Debtors seek to avoid, *i.e.,* (1) the original execution of the deeds to the Debtors' realty to Jonas on August 3, 1988; or (2) the declaration of default

and recording of the deed on the Dorans' Home and the docketing of the deeds on the Parker and Kerlin properties by the defendant on September 14, 1988. *Compare Butler, supra.* 862 F.2d at 1015–16 n. 1 (Court of Appeals notes without resolving a debate that has emerged regarding whether a foreclosure transfer occurs at the time of a sheriff's execution sale or relates back to the time of perfection of the original mortgage document). Since both of these potential "transfers" occurred well within the one-year time limit of § 548(a), this issue is important, but not dispositive of the Debtors' rights here.

■ Consistent with our conclusion that a foreclosure sale rather than the perfection of the underlying mortgage is the significant date of transfer in the mortgage foreclosure context under Pennsylvania law, we are inclined to consider the September 14, 1988, declaration-of-default date as the date of the transfer which should be the focus of attack under § 548(a)(2) here. All that was transferred on August 3, 1988, were deeds which were intended to be utilized solely as security devices. It was not until September 14, 1988, that these dormant security devices ripened into actual effective conveyances of the Debtors' property to the Defendant.

The significant threshold issue in determining whether the September 14, 1988, transfer can be avoided is determining whether the Debtors have established that they failed to receive "reasonably equivalent value" as a result of the transfers. Indeed, there is considerable authority for the principle that, once inadequate consideration is proven by the party seeking to avoid a transfer under § 548(a)(2) or its equivalent, the party seeking to uphold the transfer has the burden of proof as to the issue or solvency or whether a business debtor has been left with unreasonably small capital by reason of the transfer. *See United States v. Gleneagles Investment Co.,* 565 F.Supp. 556, 577 (M.D.Pa. 1983), *aff'd sub nom. United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir.), *cert. denied sub nom. McClellan Realty Corp. v. United States,* 483 U.S.

1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); *Pinto, supra,* 98 B.R. at 209; *In re Pinto Trucking Service, Inc.,* 93 B.R. 379, 388 (Bankr.E.D.Pa.1988); and *Baker v. Geist,* 457 Pa. 73, 78, 321 A.2d 634, 637 (1974). However, there is no question that the party seeking to avoid the transfer does have the burden on the issue of proving lack of "reasonably equivalent value" in the transaction. *See Pinto Trucking Service,* 93 B.R. at 388–90.

■ We do not believe that the Debtors received *any* consideration for the September 14, 1988, transfers. Before the transfers, the Debtors were potentially liable as guarantors for the full liability of PYP to the Defendant. As reflected by the confessed judgment of October 13, 1988, taken *after* the transfers, the Dorans, per the Defendant, *remained* liable to the Defendant in the same capacity in the amount of $164,622.64. We can assume that the Defendant, likewise, considered any obligation of Orsa unaffected by the transfers. Since their liability was not reduced by the transfers, the Debtors received no consideration therefor. *Compare Cole, supra,* 81 B.R. at 331 n. 2.

It is also clear that Orsa never received *anything* from the Defendant as a result of either of the transfers. Orsa was not a signatory to the Factoring Agreement, as were the Dorans. Therefore, taking its property could not relieve its liability under that Agreement, as it had no liability under it. Furthermore, Orsa received absolutely nothing at any time, even on August 3, 1988, in exchange for the pledge of virtually all of its assets in the factoring transaction.

A similar argument can be made on behalf of the Dorans. The beneficiary of the Factoring Agreement was PYP, a non-debtor entity separate from the Dorans. Arguably, the Dorans, or at least Doran himself, received certain entrepreneurial opportunities as a result of the Factoring Agreement. However, this fact is little comfort to creditors of the Dorans individually, who have seen their debtors sacrifice their most valuable asset, *i.e.,* the Home, with no direct benefit to their estate to show for it.

Therefore, it is questionable whether any consideration was ever received by either of the Debtors in either the transfer of August 3, 1988, *or* the transfer of September 14, 1988.

The Defendant argues that it gave up $96,647.58 and received in return, from both transactions, only properties in which the value of the equity was less than the sum advances. The difficulties with this argument, as revealed from the foregoing discussion, are as follows: (1) The $96,-647.58 was paid to PYP, not to the Dorans and certainly not to Orsa; and (2) If the September 14, 1988, transfer is focused upon, it is clear that no consideration was received by any party, including even PYP, therefor. There are other responses as well. For all practical purposes, the Defendant also gained effective possession of PYP in exchange for its default in the Factoring Agreement. The value of PYP is reasonably measured by the price of $250,000 which Doran paid for it on August 3, 1988, in return for its loan. The Defendant also has retained the sole right to collect PYP's accounts receivable, which, if the directory is published, could realize close to their face value of about $300,000.

Our findings as to value of the realty leads us to conclude that Orsa lost property in which it had little or no equity. However, the property was nevertheless not without value. It was producing income. Having received absolutely nothing in the transaction, Orsa clearly received less than "reasonably equivalent value" for these assets. The Dorans, meanwhile, lost equity of $75,000 in the Home and received very little, if anything, of value in return. They, too, totally failed to receive "reasonably adequate consideration" in the transaction.

Establishing the element of insolvency, assuming *arguendo* it is the Debtors' burden to prove, appears easily accomplished here. The unrebutted testimony of Doran is that he and his wife have no non-exempt assets left as a result of the loss of the Home. *Compare Pinto, supra,* 98 B.R. at 209–13 and *Corbett, supra,* 80 B.R. at 37–38. Similarly, Orsa, per Doran's unrebutted testimony, has no asset left except

an option to purchase property which, without assets, it cannot exercise. It is therefore doubtful whether either of the Debtors has *any* non-exempt assets.

On the other hand, liabilities of both abound. Orsa remains liable on all of its mortgages, which exceed $300,000. The Dorans remain liable on their home mortgage of $45,000 and in the amount of potentially over $164,000 to the Defendant. Under the applicable "balance sheet" test referenced by the Bankruptcy Code, *see* 11 U.S.C. § 101(31), we therefore conclude that both the Dorans and Orsa were clearly rendered insolvent by the transfers. *See, Pinto, supra,* 98 B.R. at 209; and *In re Art Shirt, Ltd.,* 68 B.R. 316, 322 (Bankr.E. D.Pa.1986), *aff'd,* 93 B.R. 333 (E.D.Pa. 1988).

Finally, both of the Debtors meet the disjuncture requirement of § 548(a)(2)(B)(ii). Having lost its property and its only income, the rent therefrom, as the result of the transfers, Orsa has no capital left with which to do business. The Dorans' business opportunity through PYP also appears shattered, and they are reduced to the status of middle class, non-business wage-earners.

Therefore, we conclude that the Debtors are both entitled to avoid the transfers in issue, which we deem require us to focus upon the September 14, 1988, transfers, under § 548(a)(2)(A) and either § 548(a)(2)(B)(i) or § 548(a)(2)(B)(ii).

### 4. *No relief will be granted to the Debtors under 39 P.S. § 354 or 11 U.S.C. § 548(c) at this juncture*

The Debtors cause of action based upon 39 P.S. § 354 is the equivalent of that sought under 11 U.S.C. § 548(a)(2). Because we question whether 39 P.S. § 354 sweeps as broadly as § 548 of the Bankruptcy Code as a medium to set aside involuntary, "sale-like" transfers, *see In re Frascatore, Frascatore v. Secretary of HUD,* 98 B.R. 710, 719–20 (Bankr.E.D.Pa. 1989), we do not choose to rely upon it where, as here, it is unnecessary to do so.

We also decline the Debtors' invitation to strike the Defendant's lien because of its purported lack of good faith as a transferee or obligee in the transaction. As we explained in *In re Cole,* 89 B.R. 433, 436–37 (Bankr.E.D.Pa.1988), invalidating a transfer on the basis of § 548(a)(2) merely places the parties back into the position that they assumed prior to the transfer. A judgment creditor who effects a transfer by means of an execution sale does not lose its pre-transfer judgment by the setting aside of the execution sale. *Id.* Thus, here, the setting aside of the September 14, 1988, transfers does not invalidate the August 3, 1988, transaction.

On the other hand, the Defendant is in a decidedly less secure position than the mortgagee in *Cole, supra.* The Debtors here *are* also attacking the Defendant's rights arising out of the August 3, 1988, transaction wherein the Defendant initially acquired its security interests in the Debtors' properties. *See* page 622 *infra.*

However, due to the lack of focus of the Complaint on the validity of the August 3, 1988, transaction; the consequent lack of focus on this issue at trial; the fact that the claims process has barely begun in either case; and our belief that, after setting aside an execution sale, we should allow the judgment creditor to re-sort its thinking and file a new claim, *see Cole, supra,* 81 B.R. at 338–39; and *Corbett,* 80 B.R. at 38, we are unwilling to resolve this issue at this juncture. Rather, we shall require the parties to resort to the claims process to resolve this issue. We include, in our Order, directives to move the Debtors' main cases forward to prevent excessive delay in completion of this process.

### 5. *Although we believe that the Debtors were Deprived of Due Process by the "Self–Help Execution" Procedures Effected by the Defendant, the Debtors' failure to plead this claim makes us reluctant to rule in their favor on this basis*

Our foregoing discussion of the Debtors' causes of action based upon fraudulent-conveyance theories establishes the parameters of the relief that we intend to provide.

We will set aside the transfers of the Debtors' respective parcels of realty that took place on September 14, 1988, and restore title and possession of these properties to the Debtors. However, we will defer from making any ruling at this time on the validity of any underlying claims which the parties may have against each other *inter se* arising out of the Factoring Agreement.

It is therefore unnecessary for us to consider any of the alternative theories under which the Debtors seek recovery, since relief provided on these bases would simply be duplicative of that which we indicated that we would provide on the basis of § 548. We also decline to consider fully the Debtors' alternative theories on which they attack their liability under the Factoring Agreement, as we did the parties' arguments as to the scope of the lien to which the Defendant is entitled pursuant to § 548(c), relegating these issues to the claims process. We will, however, comment on the myriad of alternative legal theories articulated by the Debtors in their Brief and outlined at pages 614–15 *supra.*

Apart from the claims under § 548, the alternative legal theory pleaded by the Debtors which we believe has the most merit is the argument that, by unilaterally seizing the Debtors' property on September 14, 1988, because of an alleged but unproven default in the Factoring Agreement, the Defendant violated the Debtors' right to due process of law, in violation of the fifth and fourteenth amendments to the United States Constitution. The procedure utilized has, if anything, more heightened due process deficiencies than the confession of judgment procedure found unconstitutional by us in *In re Souders*, 75 B.R. 427, 433–38 (Bankr.E.D.Pa.1987). Here, not even a filing in any court was made prior to the seizure of the Debtors' properties.

The salient feature of the procedure utilized by the Defendant here, akin to use of confession of judgment, is that the Defendant, without having proven that it was entitled to relief in any proceeding in which the Debtors had an opportunity to defend, proceeded to have Beinstock, as "judge," enter a judgment in its favor and have him put in motion a procedure whereby Jonas, as "sheriff," effectively executed upon this judgment by passing the Debtors' deeds on to the Defendant.

At trial, the Defendant's officers argued that, since Beinstock purportedly was, under Maryland law, acting as an "officer of the court," his actions were comparable to that of an impartial judicial officer. In its Brief, the Defendant argues that its actions were legally justified, and therefore no substantive compromise of the Debtors' rights actually occurred. We find both arguments off the mark. Beinstock is not a judge. He was an attorney selected by the Defendant to produce the Affidavit in issue. Clearly, no litigant should ever be able to select and then pay his own judge to enter a decision in its favor, and then argue that the decision-making process was acceptable because "his" judge reviewed the matter "independently."

Moreover, the most significant aspect of procedural due process is that, before a judgment is entered, the party against whom a claim is made is entitled to an opportunity to raise any defenses that the party has to the claim. It is often true that parties who, in the eyes of their opponent, have no defense to a claim in fact do have defenses that their opponent either never considered or has suppressed. For this reason, procedural due process requires that, before action is taken, both sides are accorded an opportunity to be heard. We have consistently expressed this position, in *Souders, supra,* and elsewhere. *See In re C & C TV & Appliance, Inc.,* 97 B.R. 782, 788–89 (Bankr.E.D.Pa.1989) (landlord violates due process rights of its tenant in effecting a unilateral extrajudicial lease termination, because the tenant may have defenses to the termination); *In re Bell, Bell v. Philadelphia Housing Authority,* 97 B.R. 208, 215–18 (Bankr.E.D.Pa.1989) (public landlord violates due process in using a truncated procedure to evict a tenant, even if this procedure is allowed under an unwritten court policy); and *In re Adams,* 94 B.R. 838, 845–49 (Bankr.E.D.Pa.1989) (public landlord's policy of allowing its managers unlimited discretion as to when it

may evict parties claiming a tenancy violates due process).

▮ The instant factual pattern exemplifies the wisdom of assuring procedural due process protections. Beinstock was undoubtedly totally unaware of the Debtors' potential defenses to the Defendant's claims, several of which have been articulated by the Debtors to this court in this proceeding. Had he been, even he may have hesitated before setting this course of events into motion. In any event, contrary to the assertions in the Defendant's Brief, a denial of procedural due process to a defendant is not cured by the strength of the proponent's substantive claim. The Defendant is entitled to raise defenses and have the merits of these defenses laid to rest before a judgment supporting an execution can occur. Here, the Defendant effectively selected its own decision-maker; presented its claim to him ex parte without according the Debtors or PYP any opportunity to defend; obtained a "judgment;" and effected a "self-help execution" process reminiscent of that which we condemned in *B. Cohen & Sons, supra,* 97 B.R. at 814–16, without providing the Debtors with any opportunity to be heard as to their defenses to its claims. This course of events is, we find, far removed from the minimum requirements of procedural due process.

Despite the depth of our conviction that the Debtors' due process claims would justify our overturning the deed transfers of September 14, 1988, there is a flaw in utilizing that theory here. The Debtors failed to plead this theory in their Complaint, nor have they moved at any time to amend their Complaint, *see* B.Rule 7015 and F.R. Civ.P. 15(b), to add such a claim. We therefore question whether this theory may now serve as a basis for relief. *See Evans Products Co. v. West American Ins. Co.,* 736 F.2d 920, 922–24 (3d Cir.1984); and *In re Railroad Dynamics, Inc., Altenberg v. Frankford Trust Co.,* 97 B.R. 239, 247 (Bankr.E.D.Pa.1989).

The relief which the Debtors would be accorded under this theory would be no more than the Debtors would be entitled to

obtain under their properly-pleaded § 548(a)(2) claim. Therefore, since the Debtors will obtain their primary goal of invalidation of the transfers of the deeds of the realty to the Defendant on September 14, 1988, on another independent basis, we need not rely on this theory as a basis for our decision. Therefore, we decline to do so.

6. *We hesitate to conclude that the deficiencies in the contents of the deeds would bar their efficacy*

The Debtors, somewhat creatively, argue that applicable Pennsylvania state law, 16 P.S. § 9781, requires first, that a deed include a certification of the grantee's residence and that non-conforming deeds are not to be recorded, 16 P.S. § 9632. Next, they argue that the acknowledgments contained in the deeds are not in conformity with 21 P.S. §§ 291.5, 291.7, and hence the acknowledgments were defective. 21 P.S. § 42. From these accurate premises, the Debtors conclude that these defective deeds are subject to attack by Orsa, as trustee, and by the Dorans standing in the shoes of the Chapter 13 Trustee, *see* pages 615–616 *supra,* under 11 U.S.C. § 544(a).

The Defendant's response that these defects are immaterial because such deficiencies do not affect the validity of the deeds as to the parties thereto, *see Abraham v. Mihalich,* 330 Pa.Super. 378, 382, 479 A.2d 601, 603 (1984), though substantively accurate, misses the mark here. The attack of the Debtors, made from the vantage point of trustee, allows the avoidance of any transfer which is subject to attack by a hypothetical bona bide purchaser. *Compare In re Aikens,* 83 B.R. 344, 347–48 (Bankr.E.D.Pa.1988) (a debtor may not successfully attack the validity of an imperfect recording of a water and sewer lien from his own vantage point as a debtor) *with Aikens, supra,* 94 B.R. 869, 873 (Bankr.E.D.Pa.1989) (the same debtor succeeds in an attack of the same lien from the vantage point of the trustee under 11 U.S.C. § 545(2)).

There is no question that a failure to record a deed, though not subjecting the

deed to attack by a party to the transaction, does subject the deed to attack by a trustee invoking § 544(a). *See In re Allenwear & Associates, Inc.,* 89 B.R. 531, 533 (Bankr.E.D.Pa.1988); and *In re Duffy-Irvine Associates,* 39 B.R. 525, 527–30 (Bankr.E.D.Pa.1984).

However, we would hesitate to grant relief to the Debtors on this basis because, although the deeds did indeed contain defects which might have prevented their recordation, the deeds *have* in fact already been recorded (in the case of the Home) and "docketed" (in the case of the Parker and Kerlin properties). We have found no Pennsylvania statute nor case stating, like the statute and holding under Tennessee law in *In re Anderson,* 30 B.R. 995, 1000–08 (M.D.Tenn.1983), cited by the Debtors, that such defects permit retroactive invalidation of a recorded deed. Moreover, there is authority, under Pennsylvania law, that an acknowledgement of a deed is a judicial act which, once effected, even if in error, can be undone only upon proof of fraud. *See Hornbeck v. Mutual Bldg. & Loan Ass'n,* 88 Pa. 64, 66 (1878); and *Abraham, supra,* 330 Pa.Super. at 382, 479 A.2d at 603. Though we have located no decision on point, it would not be illogical to conclude that the recording of a deed, even if done in error because of a failure of the deed to contain the grantee's address, may not be undone in the absence of a showing of fraud.

In sum, we are reluctant to conclude that the defects in the deeds in question would empower anyone, even a subsequent bona fide purchaser, to invalidate the recording of the deeds retroactively. We note that the recording itself, albeit the recording of a defective deed, is sufficient to place a bona fide purchaser on notice of the transfer. *See McCannon v. Marston,* 679 F.2d 13, 15–17 (3d Cir.1982) (trustee may not avoid transfer of which he has constructive notice despite the absence of a duly-recorded agreement of sale). Therefore, we decline to rule in favor of the Debtors on this basis.

7. *We similarly hesitate to conclude that the Defendant is an "insider" of the Debtors and therefore conclude that the Debtors may not attack the transfer in issue as preferential under 11 U.S.C. § 547(b)*

The Debtors also attack the September 14, 1988, deed transfers as preferential transfers, avoidable under 11 U.S.C. § 547. Without analyzing the other requisite elements, we observe, as we did at trial, that a rather glaring impediment to this claim arises from the fact that the transfers were made just beyond the 90–day period established in 11 U.S.C. § 547(b)(4)(A).

The Debtors' attempt to surmount this obstacle by arguing that the one-year limitation period of § 547(b)(4)(B), applicable to "insider" transfers, is applicable to the transfers in issue here. This argument is based upon the following premises: (1) The Defendant is their "affiliate," because it is "operating" PYP, the main business of the Dorans, and all of the realty of Orsa. *See* 11 U.S.C. § 101(2)(D); and (2) As their "affiliate," the Defendant is an "insider" as to them. *See* 11 U.S.C. § 101(30)(E).

We are unconvinced by this reasoning. We agree with the Debtors that the term "insider" should be applied flexibly to include a broad range of parties who have a close relationship with the Debtor. *See, e.g., In re Missionary Baptist Foundation of America, Inc.,* 712 F.2d 206, 209–11 (5th Cir.1983); and *In re Acme-Dunham, Inc.,* 50 B.R. 734, 739 (D.Me. 1985). However, the burden of proving that the Defendant is, in any practical sense, an "insider" as to them, remains squarely with the Debtors. *See In re Taylor,* 29 B.R. 5, 7 (Bankr.W.D.Ky.1983). *See* 11 U.S.C. § 547(g); *In re Miller's Auto Supplies, Inc.,* 93 B.R. 342, 344 (E.D.Pa. 1988); and *In re E & S Comfort, Inc.,* 92 B.R. 616, 619–20 (Bankr.E.D.Pa.1988) (trustee has the burden of proving all elements of § 547(b) except § 547(b)(3)). The Debtors have not identified any case in which a creditor, by its act of seizing the assets of the debtor in purported execution of a remedy to which it is entitled upon the debtor's default, has thereupon become the

debtor's "insider." We therefore believe that the "operation" of the business or assets of the Debtor referenced under § 101(2)(D) contemplates activity done with the consent of the debtor, rather than, as here, a hostile takeover of the business and assets of an adversary.

Therefore, we doubt that the Debtors state a cause of action under § 547, and we decline to grant them any relief on this basis.

8. *As we indicated in our discussion of 11 U.S.C. § 548(c), we decline to rule on the Defendant's rights against the debtors under the factoring agreement at this juncture*

The Debtors argue that the advance of $96,647.58 by the Defendant to PYP on August 10, 1988, was not in conformity with the Factoring Agreement and therefore must be considered as an unsecured loan which the Defendant cannot invoke the remedies set forth in the Factoring Agreement to enforce. Also presented is a related argument that the advance was done upon terms so at variance from the Factoring Agreement that the indemnification provisions of the Agreement are unenforceable against the Debtors.

This argument lacks the equitable force of much of the Debtors' contentions, which are based upon the principle that the Defendant was guilty of gross overreaching in taking the Debtors' four properties, as well as seizing PYP, as the result of PYP's breach of the Factoring Agreement. It seems clear that Doran, on behalf of PYP, as well as the Defendant, certainly believed that the advance was made as a function of the Factoring Agreement. It does not seem fair to rule that this payment, clearly having been made with this understanding, may now retroactively be looked upon as a loan independent from the terms of the Agreement.

The equities of Doran, as to his dealings with the Defendant, are not overwhelming. It appears that he in fact did fail to comply with the terms of the Factoring Agreement. Moreover, generally, his dealings with the Defendant were marked with carelessness, incompetence, and extreme naivete.

Also, like the due process claim, these claims were not pleaded in the Complaint and therefore we are reluctant to consider them. More significantly, these claims do not relate directly to the September 14, 1988, transfers, which is all that we are prepared to deal with at this time. Rather, they concern the validity of the Defendant's underlying claims against the Debtors. Like the dispute regarding the scope of the lien to which the Defendant is entitled on the basis of § 548(c), these claims relate to the validity of the Defendant's claim that will remain *after* the transfers of September 14, 1988, are invalidated. Like the § 548(c) issue, we believe it is appropriate to relegate determination of these issues to the subsequent claims process.

9. *The Defendant's refusal to accede to the demands of the Debtors' attorney to reconvey the Debtors' properties to them was neither contemptuous, nor a violation of § 362(h), and does not entitle the Debtors to recovery of their attorneys' fees from the Defendant*

In another burst of creativity, the Debtors assert that the Defendant's failure to reconvey their property upon the demand of their counsel to do so on December 15, 1988, constituted a violation of the automatic stay, specifically 11 U.S.C. § 362(a)(3), punishable as contempt of this court's stay order or under 11 U.S.C. § 362(h); and, alternatively, that the unreasonableness of its refusal to capitulate to their attorney's demands entitles them to recovery of their attorneys' fees from the Defendant.

 We know of no authority, and the Debtors have cited none, which holds that a creditor's refusal to undo a pre-petition transfer on the ground that it might be successfully avoided has been found to constitute a violation of the automatic stay. *Compare B. Cohen & Sons, supra,* (landlord effected *post-petition* "self-help exe-

cution" against debtor's property). We are inclined to categorize such conduct on the part of the Defendant as conduct which fails to rise to the level of being "necessarily coercive," even milder than the creditor's conduct held not to be actionable as a violation of § 362(a) in *Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81, 85 (3d Cir.1988) (creditor's dispatch of letter to debtor suggesting that she would be unable to obtain further credit from it unless she reaffirmed her debt with the creditor held not to be a violation of automatic stay). *Cf. Carlton House, supra*, 93 B.R. at 870 (refusal of obligor to make payments allegedly due to a debtor, though creating a cause of action against the obligor in an accounts receivable proceeding, does not constitute a violation of the automatic stay).

If conduct of a creditor is not actionable under 11 U.S.C. § 362(h), as we believe is true of the Defendant's conduct in issue here, then it is axiomatic that the challenged conduct is not contemptuous. *See In re McLaughlin, McLaughlin v. Firemen's Trust Mortgage Corp.*, 96 B.R. 554, 557–58 (Bankr.E.D.Pa.1989). The "warning" from the Debtors' counsel that a failure to act may be contemptuous, comparable to Beinstock's "posturing" as a judge, is hardly comparable to the requisite warning from a *court* that a party's conduct is improper that should normally precede a finding of contempt. *See United States v. Norton*, 717 F.2d 767, 774 (3d Cir.1983).

Similarly, we find no conduct of the Defendant to have risen to the level of "fraudulent, groundless, oppressive or vexacious conduct," which the Debtors claim could justify fee-shifting under the narrow exception to the "American Rule" as an instance in which the defenses asserted are "patently frivolous." *See Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 n. 5, 88 S.Ct. 964, 966 n. 5, 19 L.Ed.2d 1263 (1968). The Defendant simply took actions which, while possibly classifiable as over-reaching, were not without some legal basis. As this Opinion indicates, only certain of the Debtors' claims actually had merit. The operation of 11 U.S.C. § 548(a)(2), upon which the relief granted by us is based, is often

difficult for parties and counsel unfamiliar with it to comprehend. We cannot say that defending this action was, therefore, either "fraudulent, groundless, oppressive or vexacious." The normal rule is that fee-shifting is inappropriate "absent exceptional circumstances" such as those which appeared in cases such as *Newman, supra. Alyeska Pipe Line Services Co. v. Wilderness Society*, 421 U.S. 240, 247–64, 95 S.Ct. 1612, 1616–25, 44 L.Ed.2d 141 (1975). *See also, e.g., In re Nickleberry*, 76 B.R. 413, 423–24 (Bankr.E.D.Pa.1987). The normal rule is applicable here and bars the Debtors' claims for recovery of their attorneys' fees from the Defendant.

### E. CONCLUSION

In drafting our Order, we include a directive requiring the Debtors to promptly prepare their Schedules, Statements, and other necessary papers. Although the delay in preparation of these documents may have heretofore been partially excused by the uncertainty surrounding the result in these proceedings, and the documents prepared may be rendered imprecise by the possible loss of records in the landlord's seizure of PYP's records and other materials; some effort must be made to produce these documents *now*. Otherwise, these cases will stagnate and the final determination of certain rights of the parties, which we hold must be kept in abeyance at this time, will never transpire.

An order consistent with the conclusions set forth in this Opinion will be entered.

### ORDER

AND NOW, this 25th day of April, 1989, after a consolidated trial on the above-entitled adversary proceedings on February 23, 1989, and February 27, 1989, and upon consideration of the Proposed Findings of Fact and Conclusions of Law and Briefs submitted by the parties, thereafter, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Defendant, MBA FINANCIAL, INC., and against the Debtor–Plaintiffs, ORSA AS-

SOCIATES, INC. and GEORGE C. DORAN, SR., and GLORIA J. DORAN, as to all claims set forth in Adversary No. 89–0004S. Accordingly, the Complaint in that proceeding is DISMISSED with prejudice.

2. Judgment is entered in part in favor of the Debtors and against the Defendant in Adversary No. 89–0005S.

3. The transfers of September 14, 1988, or thereafter, of any interests of the Debtors in the premises situated at 36 Indian Creek Entry, Levittown, PA; 850 Parker St., Chester, PA; 1110 Kerlin St., Chester, PA; and 2100 E. York St., Philadelphia PA; are hereby set aside, pursuant to 11 U.S.C. § 548(a)(2). All other claims of the Debtors are DENIED and DISMISSED.

4. On or before May 1, 1988, the Defendant shall take all steps necessary to effectuate paragraph three of this decision.

5. The Debtors shall file all required documents in their cases, including all Statements, Schedules, and in the Chapter 13 case, shall file their Plan, on or before May 3, 1989, or these cases may be dismissed, or, in the case of the Chapter 11 filing, converted to Chapter 7.

6. The United States Trustee and the Standing Chapter 13 Trustee shall schedule meetings of creditors pursuant to 11 U.S.C. § 341 in the Chapter 11 and the Chapter 13 cases, respectively, after notice to all interested parties, on or before June 16, 1989.

7. The determination of the rights of the Defendant pursuant to 11 U.S.C. § 548(c) shall be DEFERRED for resolution in the claims process of the Debtors' cases. If it has not already done so, the Defendant shall file any Proofs of Claim or Amended Proofs of Claim in those cases on or before May 31, 1989, or be barred from filing same thereafter.